Gilman WASTVEDT, an individual; Osten H. Pladson, an individual; James N. Kent and Ethel B. Kent, husband and wife; Harley Nash, as Personal Representative of the Estate of H.M. Nash, deceased; Joseph Noff, as Personal Representative of the Estate of Emelia R. Nash, deceased; Harley Nash, an individual, and as Personal Representative of the Estate of Theodore Huus, deceased; Alpha Huus, an individual; and Lowell Brieland, as Personal Representative of the Estate of Theodore Huus, deceased, Plaintiffs and Appellants,

v.

Robert VAALER, an individual; and Vaaler, Gillig, Warcup, Woutat, Zimney & Foster, Chartered, a professional corporation, Defendants and Appellees.

Civ. No. 870344.

Supreme Court of North Dakota.

Oct. 18, 1988.

Paul G. Neimann (argued) and Dave F. Senger (appearance), of Moss & Barnett, Minneapolis, Minn. and Mack, Moosbrugger, Ohlsen, Dvorak & Carter, Grand Forks, for plaintiffs and appellants.

Nilles, Hansen & Davies, Ltd., Fargo, for defendants and appellees; argued by J. Gerald Nilles. Appearance by Duane H. Ilvedson.

LEVINE, Justice.

The plaintiffs, Gilman Wastvedt, Osten H. Pladson, James N. Kent, Ethel B. Kent, H.M. (Herb) Nash, Emelia R. Nash, Theodore Huus, Alpha Huus, and Harley Nash, appeal from a judgment notwithstanding a jury verdict which set aside a $168,185.63 verdict in their legal malpractice action against the defendants, Robert Vaaler and Vaaler, Gillig, Warcup, Woutat, Zimney & Foster, Chartered, a professional corporation. We affirm.

The plaintiffs' legal malpractice claim centers on the January 8, 1982 sale of their majority ownership of the Farmers and Merchants National Bank of Hatton [Bank] to Omar Vein. At the time of the sale, Wastvedt, Pladson, James Kent, Harley Nash, Herb Nash, and Theodore Huus were on the Board of Directors and shareholders of the Bank.[1] Wastvedt, Pladson, Kent, and Huus were "outside" directors who were not employed by the Bank and were retired farmers in the Hatton community. Herb Nash and Harley Nash were "inside directors" who were employed by the Bank and were involved in its day-to-day management.

In April 1980 the United States Comptroller of Currency issued a Bank Examination Report expressing concern with the ratio of the Bank's capital to its "substandard, doubtful, or loss" loans. The Report described numerous violations of 12 U.S.C. § 84[2] regarding overline loans approved by the directors and warned of the potential

---

**1.** Ethel Kent is the wife of James Kent. Emelia Nash was the wife of Herb Nash. Alpha Huus was the wife of Theodore Huus. The evidence adduced during trial established that Ethel, Emelia, and Alpha relied on their husbands regarding the transaction involved in this case and their husbands were acting as their agents in all matters involving the transaction. At the time this action was commenced Theodore Huus, Herb Nash, and Emelia Nash had died and were represented in this action by their respective personal representatives.

**2.** 12 U.S.C. § 84 provides, in part:
"(a)(1) The total loans and extensions of credit by a national banking association to a person outstanding at one time and not fully secured, as determined in a manner consistent with paragraph (2) of this subsection, by

collateral having a market value at least equal to the amount of the loan or extension of credit shall not exceed 15 per centum of the unimpaired capital and unimpaired surplus of the association.
"(2) The total loans and extensions of credit by a national banking association to a person outstanding at one time and fully secured by readily marketable collateral having a market value, as determined by reliable and continuously available price quotations, at least equal to the amount of the funds outstanding shall not exceed 10 per centum of the unimpaired capital and unimpaired surplus of the association. This limitation shall be separate from and in addition to the limitation contained in paragraph (1) of this subsection."

personal liability of directors who had approved the overline loans. The Comptroller demanded that the Bank obtain new management and additional capital of $400,000. In response to the Report, the Bank directors hired Vaaler to represent the Bank in its dealings with the Comptroller.

During the next year, the Bank did not meet the Comptroller's demands, and on behalf of the outside directors, Wastvedt and Huus met with Vaaler and asked him to help them sell their shares of the Bank. Wastvedt testified that he asked Vaaler to bill them personally for that visit because it was of a personal nature. When Vaaler suggested that the stockholders might have to sell fifty-one percent ownership in the Bank in order to attract new management and an owner who would furnish capital to the Bank, the outside directors approached Herb and Emelia Nash who agreed to sell their shares. They also approached Harley Nash and he agreed to sell enough of his shares so that the directors and their wives, as a group, could provide a potential buyer with fifty-one percent of the shares, as suggested by Vaaler.

During the fall of 1981, the plaintiffs discussed the sale of stock with David Egge, a potential buyer. Another individual, Oliver Haugen, chairman of the board of the Buxton Bank, also expressed interest to Wastvedt in the possible purchase of plaintiffs' stock by the Buxton Bank. Further negotiations with these potential buyers did not materialize, and in November 1981, Vaaler suggested that one Omar Vein might be interested in purchasing control of the Bank. On November 27, 1981, Vein met with the plaintiffs to discuss the possible purchase of control of the Bank. On December 1, 1981, Vein again met with the plaintiffs and a proposal was executed wherein Vein agreed to purchase 2,150 shares of stock at $200 per share from the plaintiffs for a total price of $430,000. That proposal also included a provision for a reduction in purchase price based on the Bank's write-off of classified loans:

"The purchase price shall be subject to a reducing credit which shall be any sums which the bank may lose as the result of loans presently carried on the books of the Farmers and Merchants National Bank of Hatton which have been classified as substandard, doubtful or loss items on the Report of Examination of the bank as conducted by the Comptroller of the Currency, said Report of Examination being dated the 2nd day of June, 1981, reference to which is hereby had."

After the December 1, 1981 proposal was executed, the Comptroller's June 2, 1981 report became available. The report classified about $130,000 of the Bank's loans as "substandard, doubtful or loss" which, pursuant to the write-off clause in the proposal, resulted in a corresponding reduction in the purchase price of the stock. The plaintiffs and Vein then executed a Stock Purchase Agreement dated January 8, 1982, whereby Vein purchased 2,150 shares of stock from the plaintiffs for $300,000 or $139.52 per share. Pursuant to that Stock Purchase Agreement, Vein made a $75,000 downpayment, with the remaining $225,000 to be made in three equal installments. That Stock Purchase Agreement also provided, in part:

"If at any time during the period while this Agreement is being performed, and prior to the last payment date as provided above, the Bank shall suffer any losses from any loans or investments that are listed on any of the three categories in the report of examination referred to above, the amount of such loss may be deducted from the then upcoming installment of the purchase price to be paid by the Buyer to the Sellers (hereinafter referred to as 'Deductions'). The Deductions shall first be deducted from interest on each installment and the balance to reduction of principal. The amount guaranteed by the Sellers, and the maximum Deductions which may be credited against the purchase price pursuant to this Agreement shall be the sum of Two Hundred Twenty-five Thousand and no/100 Dollars ($225,000.00) plus interest thereon."

The plaintiffs did not receive the remaining $225,000 due under the Stock Purchase Agreement because subsequent Comptroller Reports wrote off an equivalent sum of substandard, doubtful, or loss loans. The plaintiffs thereafter commenced this legal malpractice action against the defendants, alleging that, in representing them in the stock transaction, Vaaler failed to disclose a conflict of interest arising from an attorney-client relationship between him and his longtime friend, Vein; that Vaaler was negligent in drafting the Stock Purchase Agreement and in advising the plaintiffs about the transaction. The defendants denied that an attorney-client relationship existed between Vaaler and the plaintiffs and alleged that Vaaler was employed solely to represent the Bank in connection with the Comptroller's demands. The defendants also denied that Vaaler's conduct was the proximate cause of any damage to the plaintiffs.

The jury returned a special verdict, finding that there was an implied attorney-client relationship between each plaintiff and Vaaler; that, with respect to each plaintiff, Vaaler committed legal malpractice consisting of a conflict of interest, negligent advice, and negligent drafting of the Stock Purchase Agreement; that Vaaler's legal malpractice caused damage to each of the plaintiffs; that the plaintiffs were each thirty-five percent contributorily negligent; and that the plaintiffs, as a group, suffered total compensatory damages in the amount of $224,997.50. After reducing the damages to reflect the plaintiffs' contributory negligence, judgment was entered for $168,185.63 including interest and excluding costs and disbursements.

Vaaler and his law firm then moved for judgment notwithstanding the verdict. The trial court granted the motion, holding that the plaintiffs had failed to establish by expert testimony the standard of care and departure from that standard for negligent drafting of the Stock Purchase Agreement and for negligent advice; that there was insufficient evidence to establish an implied attorney-client relationship between Vaaler and the three Nashes; and that although there was sufficient evidence to establish a conflict of interest, there was no evidence that the conflict proximately caused damage to the plaintiffs. The plaintiffs have appealed.

In *Okken v. Okken*, 325 N.W.2d 264, 267 (N.D.1982), we outlined the appropriate standard for analyzing a motion for judgment notwithstanding the verdict:

"In determining if the evidence is sufficient to create an issue of fact, and hence in determining if judgment n.o.v. should be granted, the trial court must employ a rigorous standard with a view toward preserving verdicts. *Riebe v. Riebe*, 252 N.W.2d 175 (N.D.1977). The test is whether or not the evidence, when viewed in the light most favorable to the party against whom the motion is made, leads to but *one* conclusion as to the verdict about which there can be no reasonable difference of opinion. *Staiger v. Gaarder*, 258 N.W.2d 641 (N.D.1977). In employing this standard, the trial judge is not free to consider the weight of the evidence or to judge the credibility of witnesses; on the contrary, he is required to accept the truth of the evidence presented by the party opposing the motion and the truth of all reasonable inferences from that evidence which support the jury verdict. *Riebe, supra*, 252 N.W. 2d at 177; 9 Wright & Miller, *Federal Practice and Procedure*, Civil 2524. The trial court must give proper deference to the jury's evaluation of the evidence and its judgment of the credibility of witnesses under a motion for judgment n.o.v.

"In order to determine whether or not the trial court erred in granting Clifford's motion for judgment n.o.v., we must examine the trial record and then apply the same standard that the trial court was required to apply initially. See *Riebe, supra*, 252 N.W.2d at 177."

In order to prevail in a malpractice action against an attorney for negligence, a plaintiff must establish the following elements: (1) the existence of an attorney-client relationship; (2) a duty by the attorney to the client; (3) a breach of that duty by the attorney; and (4) damages to

the client proximately caused by the breach of duty. *Martinson Bros. v. Hjellum,* 359 N.W.2d 865 (N.D.1985); *Blue Water Corp., Inc. v. O'Toole,* 336 N.W.2d 279 (Minn. 1983); *see generally* Mallen & Levit, Legal Malpractice, 2d Ed. (1981) § 100 *et. seq.* The standard of care or duty to which an attorney is held in the performance of professional services is that degree of skill, care, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in the State. *Martinson Bros. v. Hjellum, supra.*

The plaintiffs argue that the trial court erred in concluding that they had failed to produce sufficient evidence to establish damages that were proximately caused by Vaaler's conduct. They argue that there were several bases upon which the jury could have concluded that they incurred damages which were proximately caused by Vaaler's conduct and therefore reasonable minds could not draw but one conclusion from the evidence.

■ The plaintiffs first contend that they established that Vaaler's conduct proximately caused damage to them because when they signed the Stock Purchase Agreement on January 8, 1982, Vaaler did not explain the significance of the write-off clause and advised them to sell their stock pursuant to an agreement which resulted in their receipt of only the $75,000 downpayment and the write-off of the $225,000 balance. However, this argument overlooks the fundamental proposition that before an attorney's advice or conduct can be the proximate cause of damage, the plaintiffs must establish that the advice or conduct falls below the applicable standard of care and constitutes therefore a breach of duty. Stated simply, a plaintiff must establish each element of an action for malpractice, and an attorney's duty and breach of duty are two of those elements. *Martinson Bros. v. Hjellum, supra; Blue Water Corp., supra.*

■ Generally, expert testimony is necessary to establish the professional's standard of care (duty) and whether the professional's conduct in a particular case deviated from that standard of care (breach of duty). *Sheets v. Letnes, Marshall & Fiedler, Ltd.,* 311 N.W.2d 175 (N.D.1981) [legal malpractice]; *Winkjer v. Herr,* 277 N.W.2d 579 (N.D.1979) [medical malpractice]; *see generally,* Annot., 14 A.L.R.4th 170 (1982). *See also* N.D.R.Ev. 702. There is an exception to the requirement of expert testimony if the trier-of-fact can adequately evaluate the professional's conduct without expert testimony. *Winkjer v. Herr, supra; see* Annot. 14 A.L.R.4th 170 (1982). The exception applies when the professional's misconduct is so egregious and obvious that a layperson can comprehend the professional's breach of duty without the assistance of expert testimony. *Carlson v. Morton,* 745 P.2d 1133 (Mont. 1987); *Bent v. Green,* 39 Conn.Super. 416, 466 A.2d 322 (1983); *Winkjer v. Herr, supra; Childers v. Spindor,* 84 Or.App. 407, 733 P.2d 1388 (1987); *see* Annot., 14 A.L.R.4th 170 (1982).

Not surprisingly, whether or not expert testimony is necessary in a particular case depends upon the facts of that case. Expert testimony on the standard of care and deviation from that standard was deemed not necessary when an attorney failed to: appear in court on his client's behalf, *Bowman v. Doherty,* 235 Kan. 870, 686 P.2d 112 (1984); notify a client of termination of employment, *Central Cab Company v. Clarke,* 259 Md. 542, 270 A.2d 662 (1970); inform a client of a settlement offer, *Joos v. Auto–Owners Insurance Co.,* 94 Mich. App. 419, 288 N.W.2d 443 (1979); follow a client's instructions and adequately insulate it from creditors, *Hill v. Okay Const. Co., Inc.,* 312 Minn. 324, 252 N.W.2d 107 (1977); or file an action within the statute of limitations, *George v. Caton,* 93 N.M. 370, 600 P.2d 822 (1979); *compare Sheets v. Letnes, Marshall, & Fiedler, supra,* where we held summary judgment inappropriate on the issue of a breach of duty for failure to file an action within the statute of limitations because the question of which statute of limitations applied was one of first impression, and we said that expert testimony was permissible to estab-

lish the standard of care under the circumstances.

Expert testimony is necessary if the attorney's representation involves complex matters such as: incorporating a business, *Carlson v. Morton, supra;* tax planning, *Bent v. Green, supra;* trial tactics, *Childers v. Spindor, supra;* real estate transactions, *Cleckner v. Dale,* 719 S.W.2d 535 (Tenn.Ct.App.1986); or specialized knowledge, *Wright v. Williams,* 47 Cal.App.3d 802, 121 Cal.Rptr. 194 (1975); because a jury cannot rationally apply negligence principles to professional conduct without evidence of what a reasonable attorney would have done under the circumstances and the jury may not be permitted to speculate about what the professional custom may be. *Hughes v. Malone,* 146 Ga.App. 341, 247 S.E.2d 107 (1978). Consequently, except in rare cases, the nuances and variations of the practice of law make indispensable expert testimony to acquaint the trier-of-fact with the applicable standard of care and any deviation therefrom. *Cleckner v. Dale, supra; Carlson v. Morton, supra.*

The plaintiffs presented evidence that Vaaler did not explain the ramifications of the write-off clause to them which, pursuant to *Okken, supra,* we must accept as true. The plaintiffs also presented expert testimony that generally, an attorney has a duty to "disclose to his clients the significance of a document which his client would sign in a legal transaction" and that duty "extend[s] to the various clauses and provisions in that document." However, the plaintiffs' expert was not asked if Vaaler breached his duty of care by not explaining *this* write-off clause, particularly in light of the plaintiffs' knowledge of the substandard loans; and the plaintiffs presented no evidence to establish that a failure to explain the significance of *this* write-off clause in *this* transaction was a deviation from Vaaler's standard of care. Indeed, the plaintiffs' expert testified that he had only limited knowledge of the particular facts of this case, and he was not asked a hypothetical question about the necessity for explaining this write-off clause. Moreover, the plaintiffs' expert testified that he had never represented a party who was buying or selling a bank in a transaction such as this.

This transaction involved banking laws and regulations, an exceedingly complex and specialized area of the law. We cannot say that the failure to explain the implications of this write-off clause was so obvious and egregious as to dispense with the need for expert testimony. Whether the experience and degree of sophistication of these banker-plaintiffs and the degree of clarity of this write-off clause, a clause which duplicated the clause in the earlier December 1, 1981 proposal, imposed a duty to explain was for an expert to say. We conclude that expert testimony was necessary to explain whether the failure to explain the ramifications of this write-off clause was a deviation from the appropriate standard of care because that conduct is not a matter within the common knowledge of a layperson. In the absence of that testimony, we hold that there was insufficient evidence to establish that Vaaler's failure to explain this write-off clause constituted a breach of duty to the plaintiffs.[3] It is therefore unnecessary to con-

3. Although the defendants moved for a directed verdict, asserting in part that there was no expert testimony to establish an attorney's applicable standard of care, the motion was denied. However, in granting the defendants' motion for judgment notwithstanding the verdict on the basis of negligent drafting and negligent advice, the trial court stated: "This is something that I almost ruled on by granting a motion for directed verdict at the time of trial, but to preserve the record and avoid a new trial I did not do so." The trial court's denial of the motion for a directed verdict was obviously based on the judicial economy of avoiding a new trial in the event of an adverse ruling on appeal. However, that rationale has limited application when there is no evidence on an issue for the trier of fact to consider. We recognize that the exigencies of jury trial often make it difficult for the trial court to accurately assess the state of the evidence in ruling on a motion for a directed verdict, and we have encouraged the practice of erring on the side of caution by allowing the jury to decide issues on which the trial court is uncertain about the evidence. However, in this case we agree with the trial court's assessment that because there was no evidence on whether Vaaler's failure to explain this write-off clause was a deviation from an attorney's standard of care in advising a client, and no evidence on the

sider whether that claimed breach of duty was the proximate cause of damages to the plaintiffs.

The plaintiffs next argue that as a result of Vaaler's conflict of interest, they received less than the market value for their stock. They point to other sales of stock for $200 per share as evidence for the jury's determination that they would have received more than the $75,000 downpayment had Vaaler's loyalty to them been undivided.

Relying on *Blue Water Corp., Inc. v. O'Toole*, 336 N.W.2d 279 (Minn.1983), the defendants respond that the ultimate determination of whether Vaaler's conflict of interest was the proximate cause of any damages suffered by the plaintiffs rests upon what another buyer would have paid for the stock and upon what terms and conditions that buyer would have purchased the stock. The defendants contend that because the plaintiffs did not present that evidence, there was no evidence for the jury to conclude Vaaler's conflict of interest proximately caused damage to the plaintiffs, and the trial court properly granted judgment notwithstanding the verdict.

In *Blue Water Corp., Inc. v. O'Toole*, supra, Blue Water and its incorporators brought a legal malpractice action against attorney O'Toole for his failure to file a timely application with the Minnesota Commerce Commission for a bank charter. Before O'Toole filed the corporation's application, the Minnesota Legislature enacted a law authorizing branch banks and two nearby banks received branch bank permits for the town in which Blue Water sought to establish its bank, thereby eliminating Blue Water's purpose for incorporating. A jury found O'Toole negligent and awarded $100,000 for lost profits that the bank might have earned had the charter been approved.

 The Minnesota Supreme Court reversed, holding that Blue Water and its incorporators had failed to establish that

applicable standard of care for an attorney in drafting a document, a directed verdict on those

even had the application been timely filed, the Commerce Commission would have granted the charter. *Blue Water* applied the "case-within-a-case" doctrine for analyzing whether O'Toole's conduct was the proximate cause of damages. *Christy v. Saliterman*, 288 Minn. 144, 179 N.W.2d 288 (1970). That doctrine applies to allegedly negligently conducted litigation and requires that but for the attorney's alleged negligence, the litigation would have terminated in a result more favorable for the client. *See* Mallen & Levit, Legal Malpractice, 2d Ed. (1981), § 551; Annot. 45 A.L.R. 2d 5 (1956); Annot. 45 A.L.R.2d 62 (1956). Similar principles of proximate cause and damages are applicable to legal malpractice cases involving a conflict of interest. *Lange v. Marshall*, 622 S.W.2d 237 (Mo. App.1981); *Johnson v. Jones*, 103 Idaho 702, 652 P.2d 650 (1982); *see* Annot. 28 A.L.R.3d 389, 393–94 (1969).

Thus, in *Lange v. Marshall, supra,* attorney Marshall was representing both husband and wife in a marriage dissolution when they entered into a stipulation of property settlement. The wife had second thoughts and she and her husband each sought independent counsel. Ten months of negotiations by independent counsel resulted in a second property settlement. The wife sued Marshall for malpractice for the first settlement and sought damages for ten months of lost maintenance payments which her husband discontinued after she obtained independent counsel and repudiated the original settlement, fees for accountants and private investigators necessary to prepare for litigating a better settlement after she repudiated the original settlement, legal fees for the second settlement, and apartment rent, medical charges, and federal and state taxes which her husband had agreed to pay in the original settlement but refused to pay after she repudiated the settlement. A jury returned a verdict for $74,000 against Marshall.

issues should have been granted.

The Missouri Court of Appeals reversed the jury verdict, holding that the wife had failed to establish that Marshall's conduct had proximately caused damages because she presented no evidence that she would not have incurred those expenses in reaching the second settlement if Marshall's conduct had been different. The court observed that it was rank conjecture and speculation to conclude that the husband's willingness to settle the marital affairs without litigation on the basis of the original settlement established his willingness to settle without litigation at a higher figure acceptable to the wife. *See also Johnson v. Jones*, 103 Idaho 702, 652 P.2d 650 (1982), in which the court affirmed a summary judgment in favor of an attorney because the plaintiffs had failed to present any evidence that an attorney's conflict of interest in representing both the buyer and seller of a business was the proximate cause of their damages.

■ In this case the plaintiffs received only $75,000 for their stock because the $225,000 balance was eliminated by operation of the write-off clause. The plaintiffs presented no evidence to establish that, but for Vaaler's conflict of interest, they would have received the $225,000 balance or a different price for their stock. There was no evidence that an attorney with no conflict of interest would have procured a different result for the plaintiffs. There was no evidence that another buyer would have bought fifty-one percent of the Bank without the write-off clause, that another buyer would have paid more per share for control of the Bank in a transaction with a similar write-off clause, or that the inclusion of the write-off clause in the Stock Purchase Agreement was improper. Although there was evidence that some other shares of stock in the Bank were sold for about $200 per share in August 1981, before the results of the June 1981 Comptroller's Report became known, in April 1982, when the new directors sought enough shares to qualify as directors, and in August 1982,

when Vein sought to maintain confidence in the failing bank, there was no evidence that those sales involved control of the Bank or included a similar write-off provision. One of the potential buyers of fifty-one percent of the Bank, Oliver Haugen of the Buxton Bank, testified briefly at trial, but he did not testify about the price, terms, or conditions under which he or his group would have purchased the Bank. Another potential buyer, David Egge, did not testify at trial. We disagree with the plaintiffs' assertion that it would have been an impossible burden for them to have presented evidence concerning the terms and conditions under which those purchasers would have bought the Bank when, as they assert, all individuals, other than Vein, were deprived of the opportunity to analyze facts concerning the Bank. Either one of the two potential buyers, Haugen or Egge, could have analyzed the Bank's position in preparation for trial and testified about the price, terms, or conditions under which he would have purchased the Bank.

Although we recognize that proximate cause and damages are generally questions to be decided by the trier-of-fact, *Martinson Bros. v. Hjellum, supra,* under the circumstances of this case, we conclude that there was no evidence from which the jury could have concluded that Vaaler's conflict of interest proximately caused damage to the plaintiffs. The evidence therefore leads to only one conclusion about which there can be no reasonable difference of opinion, *Okken, supra,* and the trial court properly granted judgment notwithstanding the verdict on this issue.[4]

■ The plaintiffs also contend that the trial court erred in awarding the defendants $1,800 in expert witness fees for a witness who did not testify at trial. That matter is within the discretion of the trial court. *Keller v. Vermeer Mfg. Co.,* 360 N.W.2d 502 (N.D.1984). The plaintiffs have not demonstrated that the trial court

---

4. Because of our resolution of this issue, we need not consider issues raised by the plaintiffs pertaining to an implied attorney-client relationship, contributory negligence, or whether the

trial court erred in denying the plaintiffs' motion to amend their complaint to include a cause of action for treble damages under Section 27–13–08, N.D.C.C.

abused its discretion, and we affirm that award for expert witness fees.

For the reasons stated, we affirm the district court judgment.

ERICKSTAD, C.J., and MESCHKE, GIERKE and VANDE WALLE, JJ., concur.