2004 ND 37

**Richard John NESVIG, Plaintiff and Appellant,**

v.

**R. Gordon NESVIG, Defendant and Appellee.**

No. 20030041.

Supreme Court of North Dakota.

Feb. 25, 2004.

Henry H. Howe, Howe & Seaworth, Grand Forks, ND, for plaintiff and appellant.

Patrick R. Morley, Morley Law Firm, Ltd., Grand Forks, ND, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Richard Nesvig appealed from a judgment entered upon a jury verdict dismissing his action against Gordon Nesvig for breach of a fiduciary duty. We hold the jury instructions and special verdict erroneously limited the jury's consideration of Richard Nesvig's claims for legal malpractice and breach of a fiduciary duty. We reverse the judgment and remand for further proceedings.

I

[¶ 2] Richard Nesvig, a self-employed farmer living near Buxton, North Dakota, was severely injured in a 1984 automobile accident in Traill County. Gordon Nesvig, Richard Nesvig's cousin and an attorney in Cottage Grove, Minnesota, represented Richard Nesvig in settlement negotiations with the automobile insurer and in a personal injury action against Traill County and Anderson Brothers Construction. *See Nesvig v. Anderson Bros. Constr. Co.,* 490 N.W.2d 478 (N.D.1992). As a result of a settlement with the automobile insurer, Richard Nesvig received $235,000. Gordon Nesvig deducted attorney fees and other expenses, and, through an investment broker, deposited $175,000 of that settlement in a Franklin fund for Richard Nesvig.

[¶ 3] In the action against Traill County and Anderson Brothers, Richard Nesvig settled with Anderson Brothers for $50,000 and obtained a 1993 jury verdict of more than $900,000 against Traill County. After deductions for attorney fees and other expenses, Richard Nesvig received a net award of $611,768.18 in December 1993,

and Gordon Nesvig deposited the money in a Minneapolis bank in an interest bearing money market account that listed Richard Nesvig as beneficiary and Gordon Nesvig as trustee. There was no written documentation between Gordon and Richard Nesvig regarding the deposit of the money in the interest bearing money market account.

[¶ 4] According to Richard Nesvig, he met with Gordon Nesvig in East Grand Forks in December 1993 to endorse a check for the money:

A. I don't remember exact words, but I think that he just said that he could get me more interest in Minneapolis. So I signed the check and I signed off on a couple of other papers, whatever, and he sent the money to Minneapolis which was what I thought that we were going to do for a short time or whatever or you know.

Q. Okay, and so what was your understanding about what he was going to do with the money?

A. Well, I thought he was going to invest it somewhere down the road or give it to me or whatever, but I thought he was going to invest it somewhere where we could get some more money.

. . . .

Q. Okay, and when you got the money and signed the check with Gordon in December of 1993, did you give Gordon any specific instructions on what he was to do or not to do with the money.

A. No, not at the time.

Q. What did you think was going to happen with the money, based on your contact with Gordon?

A. Well, I guess we did talk a little bit. He told me he could give me more interest in Minneapolis is why I figured I could send it down there and I figured he could sent [sic] me whatever I want-

ed. I did not think that there was any problem.

Q. Okay, and did you subsequently start getting statements from something like the Franklin Fund for the money that you sent down to Minneapolis with Gordon?

. . . .

A. No, I did not.

Q. Okay. How did you—what was the process for you to get money from Gordon of the money that you had left with Gordon.

A. I would have to call him and call him and give him a, tell him what I wanted it for and give him—you know, he was tough. He would not just hand it out to me for any reason. I had to give him a good reason then sometimes he would give me some, other times he would not.

[¶ 5] According to Gordon Nesvig, he did not believe Richard Nesvig could manage the money and he received specific instructions from Richard Nesvig about the money:

A. Well, to summarize them, the one probably paramount instruction was that he wanted it readily available. He wanted, if he called me and he needed this money for something, he did not want to wait for it. And the second—

. . . .

Q. Let's go through this list, we will have you explain what was said.

A. All right. And the second item was that and I don't remember which order they were, but he did not want to lose any principal.

Q. Okay, any more?

A. Third one was that he did not want to be in the stock market is the word that we used, but I took that to mean any publicly traded security where you could lose money.

Q. How about bonds?

A. It would include bonds.

Q. Any more?

A. That is as far as I can remember. Those were the three cardinal rules.

[¶ 6] Gordon Nesvig testified he did not send Richard Nesvig statements regarding the money market account, but he normally had monthly telephone conversations with him regarding money. According to Gordon Nesvig, in early 1995 he discovered the money market account was earning interest at a lower rate than expected and he informed the bank:

you have got to do better than this or we are moving the money. Well, we have got this other account and it will produce a higher interest rate and they told me it does equate to about a thousand dollars a month. And I called Richard and I told him what had happened and I said that the bank says I have to open a new account, I have got to close the one that you have and open a new one and asked him if that was okay and he said that it was.

And then a few days or weeks later, he sent me his 1994 tax information because I did not have anything other than the 1099. He had his farm income, his Franklin fund statement, and he had his property taxes, whatever all he paid. And in that envelope is when he sent me that letter ... because he knew about the change in the bank account and that is where that thousand dollars a month—and he was really confirming that he wanted it in there. He wanted that extra thousand dollars a month, just interest.

[¶ 7] Richard Nesvig testified that, in March 1995, he sent Gordon Nesvig information for his 1994 taxes and a handwritten letter asking for a copy of his monthly statement and indicating he "would like $1,000.00 more per month when invested,

just interest. Seems fair to me." According to Richard Nesvig, he got a July 1995 statement from Gordon Nesvig, and he never got another monthly statement or $1,000.00 a month after his handwritten letter to Gordon Nesvig. According to Richard Nesvig, he was unable to get money from Gordon Nesvig when he wanted it.

[¶ 8] In November 1997, George Longmire, on behalf of Richard Nesvig, wrote Gordon Nesvig:

Reference is made to previous correspondence and telephone conferences we have had in connection with [funds belonging to Richard Nesvig]. Rick is still insisting funds belonging to him should be returned to the Norwest Bank in Hillsboro, ND.

. . . .

As indicated in our initial telephone conference, he has a good relationship with a capable woman at this time. I learned recently she had had some banking experience. Further, I feel Rick has changed greatly in the two years I have had contact with him. I feel confident his wife to be and his banker can keep him soundly managing his business affairs. You and I could also keep an eye over his shoulder and prevent him from throwing away his money.

As intimated, I do not feel he needs a conservator at this time. In fact, it is felt he would fight the appointment of a conservator.

It is also felt unless his funds are returned to this state under at least partly his supervision he will have me or some other attorney commence litigation to get this accomplished. Rick requests the funds be transferred to the Norwest Bank in Hillsboro, ND. Hope you will immediately arrange for this to be done.

Am sure in view of his family relation with you, it is understood you feel some obligation to keep him from foolishly spending this money if it is returned to this jurisdiction.

[¶ 9] In July 1998, Richard Nesvig petitioned for appointment of a "limited and special conservator." Gordon Nesvig filed a "concurrence in the need for conservator" which stated he had been acting as an "informal conservator" for Richard Nesvig since 1983 and "the portion of [Richard Nesvig's] brain that allows him to make decisions is impaired." Gordon Nesvig's concurrence stated Richard Nesvig needed a conservator who would say no to most of his requests and Gordon Nesvig had intended to make different investments, but Richard Nesvig did not want any funds at risk, did not want funds tied up for extended periods of time, and had recently indicated he wanted control of his funds, and Gordon Nesvig therefore "decided to wait until the situation stabilized." In July 1998, Norwest Bank was appointed as conservator for Richard Nesvig. In August 1998, Gordon Nesvig transferred the $548,100.88 balance in Richard Nesvig's money market account to the conservatorship.

[¶ 10] Richard Nesvig subsequently sued Gordon Nesvig, alleging Gordon Nesvig breached a fiduciary duty to Richard Nesvig by investing his money in the money market account instead of some other prudent investment. A jury returned a special verdict finding there was no agreement between Richard and Gordon Nesvig to invest the money in something other than the money market account, and Gordon Nesvig acted in good faith in failing to return money to Richard Nesvig.

II

[¶ 11] Richard Nesvig argues on appeal to this Court that the trial court erred in including a good faith defense in the special verdict form, because good faith is not a defense to a professional malpractice action. He argues Gordon Nesvig had a duty as an attorney and a fiduciary to properly advise him regarding management of the money. Richard Nesvig claims Gordon Nesvig assumed control over the money as a fiduciary and had a duty to invest the money under the prudent investor rule. Richard Nesvig claims he sustained $335,650 in damages because Gordon Nesvig failed to prudently invest the money. Gordon Nesvig responds the issue in this case was not legal malpractice, but whether he followed N.D.R. Prof. Conduct 1.15 in holding and distributing the money as requested by Richard Nesvig and whether there was an agreement between Richard and Gordon Nesvig to invest the money in something other than the money market account. Gordon Nesvig argues good faith was a proper element for the jury to consider under N.D.R. Prof. Conduct 1.15.

[¶ 12] Jury instructions must correctly and adequately inform the jury of the applicable law and must not mislead or confuse the jury. *Rittenour v. Gibson*, 2003 ND 14, ¶ 15, 656 N.W.2d 691. We review jury instructions as a whole to determine their correctness. *Id.* Instructions will be allowed if, as a whole, they advise a jury of the law on essential issues in the case. *Id.* Special verdict forms are governed by N.D.R.Civ.P. 49(a), and a trial court has broad discretion over the nature and scope of written questions submitted to the jury. *Victory Park Apartments, Inc. v. Axelson*, 367 N.W.2d 155, 165 (N.D. 1985). Although we review a trial court's use of a special verdict under the abuse-of-discretion standard, a court's exercise of discretion is necessarily based on the evidence presented and the issues involved in the case. *Id.*

[¶ 13] The trial court instructed the jury on (1) responsibility for conduct, *see* N.D.J.I.—Civil 2.01, (2) Richard Nesvig's burden to prove by the greater weight of the evidence that Gordon Nesvig breached a professional standard of care or a fiduciary duty and that the breach proximately caused damages, (3) the elements of a legal negligence and a breach of fiduciary duty claim, *see* N.D.J.I.—Civil 15.00, (4) a lawyer's standard of care, *see* N.D.J.I.—Civil 15.15, (5) a lawyer's obligation to "abide by a client's decisions concerning the objectives of representation, and, where appropriate, consult with the client as to the means by which they are to be pursued," and (6) there was "no exception to, or reduction in, the duty owed by a fiduciary because of any family relationship." The court instructed the jury on fiduciary duty:

It is undisputed that a fiduciary relationship exits in an attorney-client relationship. It is also undisputed that a trustee has a fiduciary relationship with the property owner.

If you find there was an agreement between Richard John Nesvig and R. Gordon Nesvig to invest the funds in something other than a money market account than [sic] R. Gordon Nesvig is deemed a trustee.

The court instructed the jury that a "trustee" shall invest and manage trust assets under the "prudent investor rule" and hindsight did not determine a trustee's compliance with the prudent investor rule.

[¶ 14] In language tracking N.D.R. Prof. Conduct 1.15(a) and (b), the court also instructed the jury on safekeeping property:

A lawyer is required by law to hold the property of a client that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. A lawyer holding money of a client is required to deposit such funds in an interest-bearing trust account in a bank, trust company, saving and loan association, or credit union in an account in which withdrawals or transfers can be made by the depositing attorney without delay.

Upon receiving, in connection with a representation, funds or other property in which a client has an interest, a lawyer shall promptly notify the client. Unless an agreement has been reached with the client, a lawyer shall promptly deliver to the client any funds the client is entitled to receive and, upon request by the client, shall promptly render a full accounting regarding such funds.

The special verdict and the jury's answers provided:

We, the jury duly impaneled and sworn in the above matter, make the following answers to the questions asked by the court:

1. Did R. Gordon Nesvig fail to return all or some of the funds to Richard John Nesvig when requested to do so by Richard?

ANSWER: Yes *X* No ___

2. If your answer to Question No. 1 is "Yes", was R. Gordon Nesvig acting in good faith when he failed to return the funds?

ANSWER: Yes *X* No ___

3. Was there an agreement between Richard John Nesvig and R. Gordon Nesvig to invest the funds in something other than a money market account?

ANSWER: Yes ___ No *X*

(If your answer to Question No. 1 and No. 2 is "Yes", and your answer to No. 3 is "No", or if your answer to Question No. 2 is "Yes", and your answer to No. 3 is "No", then do *not* answer questions 4–7. In this case, the foreperson shall sign the verdict and notify the bailiff.)

As a result of the jury's answers to questions one through three, the jury did not answer questions four through seven relating to proximate cause, damages, and interest.

[¶ 15] Gordon Nesvig does not dispute that good faith is not a defense to a legal malpractice case. Although he claims this is not a legal malpractice case, he perhaps incongruously argues the trial court correctly included the good faith inquiry in the special verdict because that inquiry is authorized by his interpretation of a rule of professional conduct for attorneys, N.D.R. Prof. Conduct 1.15.

[¶ 16] We have said the actual nature of the subject matter of an action determines whether it is a legal malpractice case. *Johnson v. Haugland*, 303 N.W.2d 533, 538 (N.D.1981). We have defined malpractice as a "failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result that injury, loss, or damage to the recipient of those services or to those entitled to rely upon them." *Johnson*, at 538 (citing Webster's Third New International Dictionary (Unabridged 1971)). In *Johnson*, at 538, in the context of considering a statute of limitations issue, we looked at the essence of a complaint against an attorney and his law firm, and we said the allegations involved conduct in the framework of an attorney-client relationship during the course of prior litigation, which involved an alleged breach of a professional duty and a failure to inform the client of a conflict in interest. We concluded the actual nature of the subject matter of the action was legal malpractice. *Id.* at 538–39. In *Sime v. Tvenge Assoc. Architects & Planners, P.C.*, 488 N.W.2d 606, 610 (N.D. 1992), we said malpractice refers to actions where a fact-finder must evaluate the reasonableness of a defendant's conduct in light of the special knowledge and skill the defendant is presumed to have as a member of the profession.

[¶ 17] Richard Nesvig's complaint alleged Gordon Nesvig represented Richard Nesvig in prior litigation that resulted in a net award to him of $611,768.18, and based upon Gordon Nesvig's representations that he would properly invest, safeguard, and manage the money, Richard Nesvig permitted Gordon Nesvig to retain control of the money. Richard Nesvig alleged Gordon Nesvig solicited and accepted a fiduciary relationship and had a duty to prudently and responsibly invest the entrusted funds. Richard Nesvig testified he "thought [Gordon Nesvig] was going to invest [the money] somewhere down the road or give it to me or whatever, but I thought he was going to invest it somewhere where we could get some more money." Attorney James Coles, Richard Nesvig's expert, testified at trial about Gordon Nesvig's obligation:

> the basic obligation is you should not take any action that would harm your client and that would include financial harm. And, also, you have an obligation as an attorney and we have to remember they also call us attorneys and counselors at law. There is a reason for that. People look to attorneys for advice and I think there is a strong obligation to look at these funds. And as I understand it, the information that I have tells me that basically this was money from a personal injury suit and that Richard was injured to the extent that future employment was questionable. So we are looking at a sum of money that basically is the money that would have to survive him for whatever his life is, whatever his life expectancy is and what and where that money has got to go. And so I think the attorney has

to fulfill his obligation, has a strong obligation to make some inquiry or be informed as to where this money is going to go and to at least advise or assist the client as to what has to be done to accomplish that goal of having lifetime assets for support. And quite frankly, the attorney, you know, does not have the expertise for that to say how you do this, but the attorney has the obligation to say you need to find out how to do this. Maybe the attorney becomes a facilitator, but that certainly is part of the obligation to give advice that the client can then say, okay, this is what you need to do. You need to talk to an investment person or someone else that can tell you where you need to be so that these funds will survive your lifetime.

[¶ 18] The essence of Richard Nesvig's action is that he entrusted the net proceeds of his recovery in prior litigation to his attorney to properly invest, safeguard, and manage, and his attorney had an obligation to properly advise him. We conclude his action is in professional malpractice and breach of a fiduciary duty to properly advise.

■ [¶ 19] The trial court's instructions about fiduciary duty and safekeeping property and the special verdict effectively limited the jury's inquiry to whether Gordon Nesvig acted in good faith in failing to return the money to Richard Nesvig and whether there was an agreement between Richard and Gordon Nesvig to invest the money in something other than the money market account. However, an attorney who undertakes to manage or invest a client's money assumes broader responsibilities than merely establishing an agreement with the client and acting in good faith regarding return of the money.

■ [¶ 20] An attorney must employ the degree of skill, care, diligence,

and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer, *see Wastvedt v. Vaaler*, 430 N.W.2d 561, 565 (N.D.1988), and an honest belief, or good faith, is not a defense in a malpractice action. *Olson v. Fraase*, 421 N.W.2d 820, 830 (N.D.1988). *See Cosgrove v. Grimes*, 774 S.W.2d 662, 664–65 (Tex.1989) (holding subjective good faith is not defense to legal malpractice action). *See generally* 3 R. Mallen & J. Smith, *Legal Malpractice* § 19.8, at page 112–13 (5th ed.2000). An attorney-client relationship is a fiduciary relationship. *See Meyer v. Maus*, 2001 ND 87, ¶¶ 14–15, 626 N.W.2d 281. A fiduciary relationship is " 'something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance ... ordinarily exercise[d].' " *Matter of Estate of Lutz*, 1997 ND 82, ¶ 32, 563 N.W.2d 90, (quoting *Asleson v. West Branch Land Co.*, 311 N.W.2d 533, 539 (N.D.1981)). In a fiduciary relationship, the superior party has a duty to act in the dependent party's best interest. *Lutz*, at ¶ 32. A fiduciary relationship exists when one is under a duty to act for, or to give advice for the benefit of another upon matters within the scope of the relationship. *Id.* at ¶ 32, (citing Restatement (Second) of Torts § 874, cm. a (1979)). One leading commentator explains that, in various contexts, an attorney may undertake to manage or invest a client's property, and in doing so, the attorney not only must conform to the applicable standard of care and comply with fiduciary obligations, but also may assume the responsibilities of a trustee. 3 R. Mallen & J. Smith at § 25.4. Although an attorney and a client may reach an agreement about the client's funds, an attorney has an obligation as a reasonable, careful, and prudent lawyer to adequately advise

the client before the agreement is reached. *See Wastvedt*, 430 N.W.2d at 566.

[¶ 21] We reject Gordon Nesvig's claim that this case is about the narrow and limited issue of holding the funds under his interpretation of N.D.R. Prof. Conduct 1.15. That rule deals with safekeeping money in an interest bearing trust account in subdivisions (a) through (c) and authorizes and outlines a lawyer's responsibilities for interest bearing trust accounts either for the benefit of clients, or for benefit of the North Dakota Bar Foundation in subdivisions (d) through (f). The official comment to N.D.R. Prof. Conduct 1.15 provides, in part:

> The determination of whether funds of a client or third person could be invested to provide a positive net return to the client, rests in the sound judgment of each lawyer or law firm. No charge of ethical impropriety or other breach of professional conduct shall attend a lawyer's exercise of sound judgment if the lawyer acts in good faith.

[¶ 22] The North Dakota Rules of Professional Conduct were adopted by this Court effective January 1, 1988, as the result of a study of the A.B.A. Model Rules of Professional Conduct by a Professional Conduct Subcommittee of this Court's Attorney Standards Committee. *See Minutes of Professional Conduct Subcommittee of Attorney Standards Comm.* 2 (Sept. 16, 1983). The A.B.A. Model Rules of Professional Conduct do not include provisions corresponding to N.D.R. Prof. Conduct (d) through (g), or the quoted language from the official comment. As originally submitted to this Court by the Attorney Standards Committee, proposed N.D.R. Prof. Conduct 1.15 did not include the current subdivisions (d) through (g) and the quoted language from the official comment. *See* North Dakota Rules of Professional Conduct, Supreme

Court Docket Number 11437 (filed on September 12, 1986). Subdivisions (d) through (g) and the quoted language in the official comment were proposed after the 1986 North Dakota State Bar Association meeting and a September 6, 1986 meeting of the State Bar Association Board of Governors "to establish a mandatory IOLTA program in North Dakota." *See* September 22, 1986 letter from John E. Widdel, Jr., President of State Bar Association of North Dakota to Chief Justice Ralph J. Erickstad in Supreme Court Docket Number 11437. Rule 1.15 N.D.R. Prof. Conduct was adopted effective January 1, 1988 with the language in subdivisions (d) through (g) and the good faith language in the official comment. Under N.D.R. Prof. Conduct 1.15(d)(1) and (2), a lawyer must deposit a client's funds in an interest bearing trust account so the interest will benefit either the North Dakota Bar Foundation, or the client, and the lawyer's decision to place funds in either type of account is governed by factors in N.D.R. Prof. Conduct 1.15(d)(3). The history and language of N.D.R. Prof. Conduct 1.15 support a conclusion that the reference to good faith in the comment establishes a standard for a lawyer's decision to deposit money in either a client account or an IOLTA account, *see* N.D.R. Prof. Conduct 1.15(d), and does not establish a good faith defense for returning a client's money or advising the client.

[¶ 23] Our rules of professional conduct are designed to provide guidance to lawyers and a structure for regulating conduct through disciplinary agencies, and they are not intended to be a basis for civil liability. *See* Preamble, Scope, and Terms to N.D.R. Prof. Conduct. In *Disciplinary Board v. McKechnie*, 2003 ND 22, ¶ 16, 656 N.W.2d 661, we said disciplinary proceedings differ significantly from malpractice actions, and although the rules of pro-

fessional conduct set a minimal level of conduct for disciplinary actions, malpractice liability is premised upon the conduct of a reasonable lawyer under the circumstances. *See also Olson*, 421 N.W.2d at 828; *Martinson Bros. v. Hjellum*, 359 N.W.2d 865, 875 (N.D.1985); *Matter of Jaynes*, 267 N.W.2d 782, 784 (N.D.1978). We thus reject Gordon Nesvig's claim that N.D.R. Prof. Conduct 1.15 establishes a good faith defense for returning a client's money. Rather, an attorney must employ the degree of skill, care, diligence and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer, *see Wastvedt*, 430 N.W.2d at 565, and, as a fiduciary, an attorney must provide advice for the benefit of another upon matters within the scope of the relationship. *Lutz*, 1997 ND 82, ¶ 32, 563 N.W.2d 90. Although an attorney and a client may reach an agreement about the client's funds, the attorney has an obligation as a reasonable, careful, and prudent lawyer to adequately advise the client. *See Wastvedt*, 430 N.W.2d at 566.

[¶ 24] We conclude the instructions and the special verdict erroneously limited the jury's inquiry to whether Gordon Nesvig acted in good faith in failing to return the money to Richard Nesvig and whether there was an agreement to invest the money in something other than a money market account without appropriate consideration of an attorney's obligation to provide advice appropriate for the situation. We conclude those instructions did not correctly and adequately inform the jury about the applicable law on essential issues of the case, and a new trial is required. We decline Richard Nesvig's request to rule, as a matter of law, Gordon Nesvig breached a professional duty to Richard Nesvig and that the breach was the proximate cause of $335,650 in damages to Richard Nesvig. We also reject Richard Nesvig's claim for attorney fees.

III

[¶ 25] We reverse the judgment dismissing Richard Nesvig's action against Gordon Nesvig, and we remand for proceedings consistent with the opinion.

[¶ 26]CAROL RONNING KAPSNER, DALE V. SANDSTROM and WILLIAM A. NEUMANN, JJ., concur.

MARING, Justice, concurring in the result.

[¶ 27] I concur in the result. I agree with the majority opinion that the instructions and the special verdict erroneously permitted the jury to consider a good-faith defense for returning a client's money. I also agree this action is one for professional malpractice and the prudent investor rule does not apply. I write separately because I am concerned that the majority opinion does not clearly set forth the law applicable to legal malpractice. The elements of a legal malpractice claim for negligence are the existence of an attorney-client relationship, a duty to the client, a breach of that duty by the attorney, and damages to the client proximately caused by breach of that duty. *Wastvedt v. Vaaler*, 430 N.W.2d 561, 564–65 (N.D.1988); *Larson v. Norkot Mfg., Inc.*, 2002 ND 175, ¶ 10, 653 N.W.2d 33 (quotation omitted). The verdict form in the present case should ask whether there was an attorney-client relationship at all times relevant; whether the attorney committed legal malpractice by either (1) providing negligent advice or (2) failing to return the client's money upon request; and whether the attorney's negligence proximately caused damage to the client and, if so, in what amount. Conceivably the client's fault could be compared to the attorney's fault if there is evidence of such, i.e., disregard for the advice of the attorney. *Wastvedt*, at 564. It is fundamental that "before an

attorney's advice or conduct can be the proximate cause of damage, the [client] must establish that the advice or conduct falls below the applicable standard of care and constitutes therefore a breach of duty." *Id.* at 565. "The standard of care or duty to which an attorney is held in the performance of professional services is that degree of skill, care, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in the state." *Id.* We have said that, generally, expert testimony is necessary to establish the standard of care and whether an attorney deviated from that standard of care. *Id.* If the attorney's conduct is so egregious and obvious that a layperson can evaluate the breach of duty, then there is an exception to the requirement of expert testimony. *Id.* "It is well established that an attorney is liable for all losses caused by his failure to follow with reasonable promptness and care the lawful instructions of his client." *Olson v. Fraase*, 421 N.W.2d 820, 829 (N.D.1988).

[¶ 28] It is based on this law that the case should be tried on remand. I, therefore, respectfully concur in the result.

[¶ 29] Mary Muehlen Maring