# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3543

_____

Jane Nelson; Bruce Nelson; U.S. Bank   *
National Association, ND,              *
                                       *

         Appellants,         *

                                       *   Appeal from the United States
    v.                          *   District Court for the
                                       *   District of North Dakota.

First National Bank and Trust Company *
of Williston,                 *
                                       *

         Appellee.         *

_____

Submitted: June 12, 2008
Filed: October 1, 2008

_____

Before LOKEN, Chief Judge, COLLOTON, Circuit Judge, and PIERSOL,[1] District
    Judge.

_____

COLLOTON, Circuit Judge.

The beneficiaries of the Leonard Nelson Trust, Jane Nelson and Bruce Nelson, as well as the trustee, U.S. Bank National Association, N.D. (US Bank), appeal an adverse grant of summary judgment on their North Dakota breach of fiduciary duty

_____

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

claim against the trust's former trustee, First National Bank and Trust Company of Williston (First National).  We affirm the judgment of the district court.[2]

I.

Leonard Nelson established the Leonard Nelson Trust in 1998, naming First National as trustee.  The trust was designed, among other things, to pay the taxes due on his estate, and to provide income to Leonard's children, the plaintiffs, Jane and Bruce Nelson.  The trust contained 597,164 shares of Medtronic stock.  The trust also contained most of the interest in two limited partnerships, which in turn held 700,000 more shares of Medtronic stock, but the Medtronic stock held directly constituted 90 percent of the trust's marketable assets – i.e., the assets available for paying the estate tax.

The trust contains a provision, paragraph 17(b), stating that "any investment made or retained by the trustee in good faith shall be proper despite any resulting risk or lack of diversification or marketability and although not of a kind considered by law suitable for trust investments."  (Appellant App. 269).  Leonard also signed an investment authorization stating that Medtronic was a proper investment and directing the trust to retain it.  Leonard died on June 5, 2006.  At that time, First National estimated that the estate taxes, due in nine months, would total $20 to $30 million.

On October 4, the Nelsons, pursuant to paragraph 25 of the Trust, removed First National as trustee, and directed First National to act promptly to transfer the trust assets to the successor trustee, US Bank.  On October 26, First National wrote the Nelsons requesting "to continue to manage the Trust assets."  On October 30, the Nelsons' lawyer wrote First National, notifying it that the Nelsons rejected its request,

---

[2]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

and instructing it to transfer the records and assets to US Bank. On November 8, First National offered to sell the stock itself, but the Nelsons refused. On November 16, First National completed the transfer of stock to US Bank. The next day, US Bank sold all of the stock at one time, for $48.1375 per share, a price that reflects commission and volume discounts. The closing price on November 17 was $48.71 per share.

The Nelsons and US Bank brought this diversity action in federal court. They alleged that First National breached its fiduciary duties of care and prudence, which they say dictated that First National liquidate the Medtronic stock within two weeks of Leonard Nelson's death on June 5, 2006. They argued that this immediate liquidation was necessary to reduce their exposure to market risk, and to preserve the assets of the trust to pay the estate tax that would be due in nine months. They argued that they were damaged by this breach of duty, because in the two weeks after Leonard's death, the closing price of Medtronic stock fluctuated between $49.66 and $51.83 per share, which is higher than the $48.71 per share closing price on November 17, the date on which US Bank sold all of the stock.

Applying North Dakota law, the district court granted summary judgment for First National. The court reasoned that First National had acted in reasonable reliance on the express and implied terms of the trust, which provided for retention of the Medtronic stock despite any resulting lack of diversification.

II.

This case is governed by North Dakota law in effect in 2006, which provided that a trustee must comply with the State's "prudent investor rule." N.D.C.C. § 59-02-08.1 (2006). This rule, in turn, dictates that the trustee must "exercise reasonable care, skill, and caution." § 59-02-08.2. The plaintiffs rely on testimony from their expert, Ann Wernz, that a prudent trustee should "raise cash as soon as possible after the

death of a grantor of a Revocable Trust" to pay taxes and reduce market risk, and that given the composition of the trust, and the taxes coming due, First National should have liquidated its Medtronic stock within two weeks of Leonard Nelson's death.[3] Based on this evidence concerning reasonable care expected of a trustee, the plaintiffs contend that there is a genuine issue for trial concerning First National's liability.

The prudent investor rule in North Dakota, however, is a default rule that "may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust." § 59-02-08.1. The statute specifically provides that "[a] trustee is not liable to a beneficiary to the extent that the trustee acted in reasonable reliance on the provisions of the trust." *Id*. First National contends that it acted in reasonable reliance on a provision of the Nelson trust, namely, Paragraph 17(b). As noted, this paragraph establishes that "any investment made or retained by the trustee *in good faith* shall be proper despite any resulting risk or lack of diversification or marketability and although not of a kind considered by law suitable for trust investments." (Appellant App. 269) (emphasis added).

The plaintiffs argue that this provision did not limit First National's duties to the duty of good faith. They assert that Paragraph 17(b) is merely a permissive clause that permits otherwise unsuitable trust investments, and thus does not affect the trustee's fiduciary duties. *See* Restatement (Third) of Trusts § 91 cmt. f (2007) ("[T]hat an investment is permitted does not relieve the trustee of the fundamental duty to act with prudence."); *Donato v. BankBoston, N.A.*, 110 F. Supp. 2d 42, 49 (D.R.I. 2000). But the plain language of Paragraph 17(b) contradicts this assertion. It states in material part that "any investment made or retained by the trustee in *good faith* shall be proper." (emphasis added). The trust thus limits First National's potential liability in investing and retaining trust investments to instances of bad faith,

_____

[3]Appellants also argue that the district court erred by refusing to consider Wernz's affidavit, but the district court did say that it "considered" this affidavit before ruling that it did not "create a genuine issue of material fact."

-4-

as well as acts that violate the irreducible minimum prohibitions on intentional or reckless breaches of trust. *See Perling v. Citizens and S. Nat. Bank*, 300 S.E.2d 649, 651-53 (Ga. 1983) (construing a trust which dictated that "any investment retained by the Trustee in good faith shall be proper, although of a kind or in an amount or proportion not authorized by law as suitable for the Trustee"); Restatement § 87 cmt. d ("Even under the broadest grant of fiduciary discretion, . . . courts will intervene to prevent trustees from acting in "bad faith, or without regard to the terms and purposes of the trust or the interests of its beneficiaries, or for some purpose or motive other than the accomplishment of the purposes of the discretionary power," and "may also be called upon to prevent the trustee from failing to act, whether capriciously, arbitrarily, or from a misunderstanding of the trustee's powers or duties"). This limitation is proper under N.D.C.C. § 59-02-08.1.

The most enlightening discussion of "bad faith" in North Dakota law is found in *In re LePage's Trust*, 269 N.W. 53 (N.D. 1936), which suggests that a trustee granted wide discretion must nonetheless be subject to judicial scrutiny to ensure that it acts "fairly and honestly," and "without fraud or collusion." *Id*. at 58. A trustee who exercises its discretion "from any fraudulent, selfish, or improper purposes," or refuses to act for those reasons, is likely to be found in bad faith. *See* 2 Jairus Ware Perry, *A Treatise on the Law of Trusts and Trustees* § 511 (7th ed. 1929) ("Perry on Trusts") (cited in *LaPage's Trust*, 269 N.W. at 58); *Trout v. Pratt*, 56 S.E. 165, 169 (Va. 1907) (cited in *LaPage's Trust*, 269 N.W. at 58).

Plaintiffs contend that even if First National's liability is limited to acts committed in bad faith, it still may be liable for negligence. They cite *In re Trusteeship of Williams*, 591 N.W.2d 743, 748 (Minn. Ct. App. 1999), for the proposition that a negligent act cannot be made in good faith. We disagree that *Williams* stands for this proposition. The trust document in *Williams* relieved the trustee of liability for good faith "mistakes or errors of judgment," and under Minnesota law "errors of judgment" are distinct from negligent acts. *Id*. at 746-48.

Accordingly, the Minnesota court concluded that the trust document shielded the trustee from liability only for errors of judgment made in good faith, not for negligence committed in good faith. *Id.* at 748. In contrast, Paragraph 17(b) does not limit its shield to errors of judgment; it shields "any investment made or retained by the trustee in good faith." Thus, the trust protects First National from liability for ordinary negligence in investment decisions. *See Perling*, 300 S.E.2d at 653; *cf. Nesvig v. Nesvig*, 676 N.W.2d 73, 80-82 (N.D. 2004) (holding that jury instruction on good faith defense was improper because limiting defendant's duty to that of good faith immunized defendant from claims for negligence).

In the alternative, plaintiffs argue that there is a genuine issue of fact concerning whether First National acted in good faith. First, they contend that First National's actions after it was removed as trustee demonstrate that it acted in bad faith. They point to evidence that even after repeated requests to transfer the stock to the new trustee, and a letter informing First National that any requests to remain trustee would be unwelcome, First National still did not transfer the stock until asking the Nelsons to reconsider their decision to change trustees. They also suggest that First National demonstrated bad faith by retaining $180,000 of the trust's funds for two months after it finally transferred the Medtronic stock to US Bank.

This evidence does not create a genuine issue of fact about whether First National acted in bad faith *in the two weeks following Leonard's death*. The cited evidence pertains to actions by First National at later periods of time. The plaintiffs conceded at oral argument that they have not advanced a claim based on actions that occurred after First National was removed as trustee; they do not allege damage based on First National's delay in transferring the stock or its retention of the $180,000. Evidence that First National may have acted in bad faith at another time, in different circumstances, is not sufficient to create a submissible case as to whether its retention of the Medtronic stock immediately after Leonard's death was an act taken in bad faith.

Second, the plaintiffs argue that First National acted in bad faith because it did not even consider selling the Medtronic stock immediately after Leonard Nelson's death. Plaintiffs argue that such a failure to act is inconsistent with good faith. We disagree. A failure to act, like an act, may be in good faith or bad faith, just as it may be negligent or prudent. There is no evidence that First National proceeded dishonestly or with corrupt or selfish motives in respect to this particular inaction. *See* Perry on Trusts § 511. In the two weeks after Leonard's death, First National trust officer Lavina Domagala reviewed the trust document, talked to Leonard's attorney to determine the meaning of the trust, spoke with an accountant, and set up a meeting with the Nelsons. The Nelsons urge that these actions were insufficient to meet what they assert is the normal standard of care for a trustee after the death of a settlor, but the standard articulated by the Nelsons' expert is not the standard that governed under Paragraph 17(b) of the trust. Whether or not a trustee acting without the additional protections of this trust would have been obliged to consider immediate liquidation of the Medtronic stock after Leonard's death, the plaintiffs have not produced evidence that First National's failure to contemplate that step was the result of dishonesty, improper motive, or other bad faith.

Nor have the plaintiffs provided any evidence that First National's reliance on Paragraph 17(b) was unreasonable or in bad faith. Paragraph 17(b) is an integral part of the trust, because it allowed First National to follow Leonard Nelson's explicit directive, contained in his investment authorization, that it retain his Medtronic stock despite the consequent risk and lack of diversification. This directive was consistent with his repeated indications that he felt that Medtronic stock was the best investment for the trust. The plaintiffs argue that upon Leonard Nelson's death, First National's preexisting duty immediately shifted to its polar opposite: whereas during Leonard's life, the bank was directed to retain all of the Medtronic stock, in the first days after his death, it was required to liquidate all of it. They argue that when the trust became irrevocable, the investment authorization became irrelevant, because the express terms

of the trust called for the trust to pay the estate taxes, which would eventually require selling the Medtronic stock.

The trust instrument, however, gave no direction that the Medtronic stock should be liquidated after Leonard's death, and it placed no temporal limitation on paragraph 17(b), which excused the trustee from liability for risk resulting from lack of diversification or marketability. It was not unreasonable for the trustee, giving weight to Leonard's investment authorization, to retain the Medtronic stock so long as it did not interfere with the trustee's ability to meet its tax obligation. Just as the trustee was authorized by Paragraph 17(b) to depart from the ordinary standard of reasonable care for a prudent investor by failing to diversify holdings during Leonard's lifetime, it was authorized by Paragraph 17(b) to deviate from the standard that the plaintiffs' expert identifies as reasonable care for the period immediately after Leonard's death.

The nub of this dispute is not really about whether First National acted in a manner that was adequate to pay the estate taxes. It is undisputed that First National monitored the stock price daily to ensure that it did not drop so low as to interfere with the trust's ability to pay the taxes and there were plenty of proceeds from US Bank's sale of the Medtronic stock to pay the taxes when due. Rather, the damages sought by the plaintiffs are with respect to the assets left over for their use and enjoyment after the estate taxes were paid. These alleged damages are attributable to market risk and a lack of diversification in the period after Leonard's death, if not to the decision of the plaintiffs or US Bank to sell nearly 600,000 shares of Medtronic stock on a single day in November 2006. Claims alleging loss of value due to market risk and lack of diversification are just the sort of claims from which First National was protected by Paragraph 17(b) of the trust.

The judgment of the district court is affirmed.

_____

-8-