MARTINSON BROS., a partnership, and John W. Martinson, Linda L. Martinson, and Susan M. Libecki, Plaintiffs,

and

Oscar B. Martinson, Plaintiff and Appellant,

v.

John HJELLUM and the Law Firm of Hjellum, Weiss, Nerison, Jukkala & Wright, Defendants and Appellees.

Civ. No. 10593.

Supreme Court of North Dakota.

Jan. 3, 1985.

Jerome S. Rice, Minneapolis, Minn., for plaintiff and appellant.

Mart R. Vogel, of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for defendants and appellees.

VANDE WALLE, Justice.

Martinson Bros., a partnership, and John W. Martinson, Linda L. Martinson, Oscar B. Martinson, and Susan M. Libecki brought an action for damages against John Hjellum and the law firm of Hjellum, Weiss, Nerison, Jukkala & Wright alleging legal malpractice in connection with the defense of the foreclosure and deficiency-judgment suits at issue in *Oakes Farming Ass'n v. Martinson Bros.*, 318 N.W.2d 897 (N.D.1982). Following a bench trial, the district court ruled in favor of Hjellum. Oscar Martinson has appealed "from the Findings of Fact, Conclusions of Law and Order for Judgment" and from an order denying his post-trial motions. Hjellum has moved to dismiss both appeals. We deny Hjellum's motion to dismiss the appeal "from the Findings of Fact, Conclusions of Law and Order for Judgment"; grant Hjellum's motion to dismiss the appeal from the order denying Martinson's

post-trial motions; and affirm the judgment of the district court.

## MOTION TO DISMISS

On September 29, 1983, the district court issued its memorandum decision, which was designated to serve as its findings of fact, conclusions of law, and order for judgment. Judgment was entered on October 20, 1983.

Martinson has filed two notices of appeal. The first states that he appeals "from the Findings of Fact, Conclusions of Law and Order for Judgment entered in this action on the 20th day of October, 1983." [1] Hjellum asserts that we are without jurisdiction to consider this appeal.

■ Hjellum correctly points out that an order for judgment, as contrasted with the judgment itself, is not appealable. E.g., *Fey v. Fey*, 337 N.W.2d 159 (N.D.1983); *Piccagli v. North Dakota State Health Dept.*, 319 N.W.2d 484 (N.D.1982). However, the circumstances in this case are almost identical to those present in *Sacchini v. Dickinson State College*, 338 N.W.2d 81, 82 n. 1 (N.D.1983), and *Aasmundstad v. Dickinson State College*, 337 N.W.2d 792, 793 n. 1 (N.D.1983). In both *Sacchini* and *Aasmundstad* appeals were taken " 'from the Order for Judgment entered in this action on the 20th day of December, 1982.' " Because the judgments themselves, rather than the orders for judgment, were entered on December 20, 1982, we treated the appeals as being taken from the judgments.

■ In this case, the judgment was entered on October 20, 1983, and it is the only document in the record bearing that date. We therefore conclude that the appeal is, in fact, from the judgment entered on that date. Cf. *Eisenzimmer v. City of Balfour*, 352 N.W.2d 628 (N.D.1984); *Hadland v. Schroeder*, 326 N.W.2d 709 (N.D.1982).

■ Martinson's second appeal is from the district court's memorandum and order

---

1. Although Martinson was represented by counsel during the trial and during the proceedings

in this court, he filed the post-trial motions and notices of appeal pro se.

denying his post-trial motions for a new trial, for a directed verdict, for relief from judgment, and for a stay of judgment pending appeal. Martinson neither briefed nor argued in the district court or this court any issues related to these motions. See Rule 3.2(d), N.D.R.O.C. Martinson's brief in opposition to the motion to dismiss contains no response to Hjellum's arguments for dismissing the second appeal. We therefore deem it abandoned and dismiss Martinson's appeal from the district court's memorandum and order denying his post-trial motions.

## MERITS

### I. *Facts* [2]

In the fall of 1977, the Martinsons decided to purchase a 2,300-acre potato-farming operation owned by the Oakes Farming Association [Oakes]. The Martinsons met with Hjellum, who had represented them in various legal matters beginning in 1969, and requested that he review a contract which had been prepared by Oakes's attorneys for the sale of the farmland and equipment. The contract listed the total purchase price of the real and personal property as $2,702,000, with the Martinsons assuming the obligations under three other contracts. The first contract to be assumed by the Martinsons was for the sale of real property which Oakes had purchased from Orrin and Naomi Streich, the second was an equipment installment sales contract between Oakes and the Streichs, and the third was for the sale of additional real property which Oakes had purchased from Leo and Alice Spitzer. Hjellum redrafted the agreement because of various omissions in the proposed contract. The Martinsons paid $5,000 in earnest money,

and the contract was signed by all of the parties effective December 31, 1977.

The Martinsons took possession on January 1, 1978, and placed the entire farm into the production of potatoes, contrary to the advice of others to diversify. They were inexperienced in the planting, growing, harvesting, and marketing of potatoes.

Many problems befell the Martinsons during 1978. The Martinsons failed to apply a recommended herbicide to the crop, irrigation equipment worked poorly, they were unable to secure adequate financing for the potato operation because of a poor credit rating, and the market price of potatoes dropped. The Martinsons' potato harvesters were repossessed during the harvest season. Hjellum successfully negotiated for the return of the harvesters so that harvest work could continue, and also assisted the Martinsons in securing a $100,000 loan to pay for harvest labor.

The Martinsons were unable to make any payments under the terms of their contract with Oakes. As a result, Oakes was unable to pay the Streichs. In October 1978, the Streichs brought two separate lawsuits against Oakes to foreclose the contract for deed and to cancel the equipment installment sales contract. Oakes then brought a cross-claim against the Martinsons in January 1979 seeking $633,879 for their failure to make the payments due under the December 31, 1977, agreement; $434,642 for their failure to pay the installments due under the Oakes-Streich equipment installment sales contract; and to foreclose and cancel any interest the Martinsons had in the real property involved, specifically reserving its right to request a deficiency judgment in a separate action. Hjellum, on behalf of the Martinsons, filed a counterclaim and an answer to the cross-claim, but

---

**2.** Many of the following "background" facts upon which the trial court based its ultimate decision were disputed during the trial. Although Martinson did not specifically challenge the trial court's "background" findings in his issues presented for review, his brief contains several such assertions. The trial court is the ultimate arbiter of the credibility of the witnesses and the weight to be given their testimony,

and when more than one reasonable inference can be drawn from credible evidence, the reviewing court must accept the inference drawn by the trier of fact. *Weiss v. Anderson,* 341 N.W.2d 367 (N.D.1983). The trial court's "background" findings are supported by the evidence and are not clearly erroneous. Rule 52(a), N.D. R.Civ.P.

did not assert as a defense that the December 1977 agreement for the sale of the real and personal property was nonseverable under this court's decision in *McKee v. Kinev,* 160 N.W.2d 97 (N.D.1968).[3]

During the ensuing months, Hjellum advised the Martinsons to authorize a settlement and conferred on various occasions with his clients, counsel for the other parties, and the trial judge. The Martinsons, however, refused to accept any settlement offers and wished to continue to operate the farm.

The trial judge called a special term of court for March 1979 to fix a redemption period and determine possessory rights so that a crop could be produced for the 1979 season. Hjellum testified in the instant case that he believed the Martinsons faced an "impossible situation." Hjellum foresaw difficulty in proving the amounts asserted in the Martinsons' counterclaim and believed the Martinsons would be permitted little or no redemption period because they had paid only $5,000 on the $2,702,000 contract and would be financially unable to put in a crop for the 1979 season. Hjellum further testified that in view of the substantial indebtedness and the possibility of a deficiency judgment, he did not believe the Martinsons "had a ghost of a show in working it out" and continued to advise them that "this is a matter that had to be settled."

According to Hjellum, he continued to negotiate with counsel for the other parties and on March 21, 1979, reached an oral agreement with Douglas Christensen, counsel for Oakes, to the effect that Oakes would not seek a deficiency judgment if the Martinsons' financial statement demonstrated that it would not be "worthwhile" to pursue a deficiency judgment. Hjellum contacted John Martinson on March 23, 1979, and he agreed to accept the proposal. Hjellum understood the settlement to be that if the Martinsons' net worth was less than $90,000, Oakes would not seek a defi-

ciency judgment. Hjellum testified that John Martinson assured him that their financial statement would show a net worth of well below $90,000.

On March 26, 1979, the date set for trial, the parties entered into an oral stipulation in open court. During the morning proceedings, the following settlement terms were dictated into the record:

"[Mr. Christensen] (8) That Martinson Brothers shall present to Oakes Farming Association a current financial statement which shall list all of their assets and liabilities for review by Oakes Farming Association; it being specifically recognized between the parties that Oakes Farming Association is entering into this stipulation and will no longer pursue its action for monetary damages against Martinson Brothers inasmuch as it appears that Martinson Brothers liabilities, either long term or short term, exceed their assets.

"It being further recognized and agreed that Oakes Farming Association, if the information becomes available or information ascertain [sic] by Oakes Farming Association which makes it appear that the statement is incorrect as to any material matters, that Oakes Farming Association reserves the right to proceed against Martinson Brothers for any deficiencies that they may have as a result of the sale of the land purchased by Martinson Brothers."

During the afternoon session, Christensen explained:

"MR. CHRISTENSEN: Well, for the record, the agreement perhaps was not properly stated this morning when we were discussing the financial statement of the Martinson Brothers, I was trying to say that our settlement would not be in effect if there were material misrepresentations on that statement, and I would like that language utilized.

"Secondly, as far as the ninety thousand dollars, we will accept that provi-

---

**3.** In *McKee v. Kinev,* 160 N.W.2d 97 (N.D.1968), this court held in paragraph 1 of the Syllabus that "[t]he character of a contract for the sale of real estate is not destroyed where such contract also provides for sale of personal property."

sion, and we will review the financial statement and if we find that the assets exceed the sum of ninety thousand dollars, whatever or whereever they may be, then we will seek a deficiency judgment."

The subsequently entered written findings of fact, conclusions of law, order for judgment, and judgment included a provision that the Martinsons would receive a $90,000 credit for statutory exemptions if Oakes received a deficiency judgment, but did not include a provision that Oakes would not seek a deficiency judgment if the Martinsons' net worth was less than $90,000. The judgment entered pursuant to the oral stipulation also allocated separate values for the real and personal property in the December 1977 agreement.

The Martinsons furnished a financial statement dated March 29, 1979, which showed their net worth to be $46,076. Hjellum forwarded the statement to Christensen. Later in the summer of 1979, Christensen informed Hjellum that the March 1979 financial statement did not reflect a true statement of the Martinsons' assets and that Oakes intended to seek a deficiency judgment. Hjellum subsequently examined an earlier financial statement of the Martinsons dated December 1, 1978, and found a number of substantial discrepancies. Hjellum concluded that the Martinsons had "underestimated" or "misrepresented" their assets by more than $200,000 in the March 1979 financial statement. According to Hjellum, he did not confront the Martinsons concerning the discrepancies between the financial statements "because I'd lost confidence in them at that time and it was just a matter of rubbing salt in a wound."

In September 1979, Oakes brought a real property deficiency-judgment action and a personal property deficiency-judgment action against the Martinsons. Hjellum did not raise as a defense that Oakes could not seek a deficiency judgment because of the parties' stipulation. Hjellum was success-

ful in having the real property deficiency-judgment action dismissed on summary judgment. In the personal property deficiency-judgment action, Hjellum asserted as an affirmative defense that the December 1977 contract was not severable into separate values for real and personal property. The trial court granted Oakes's motion to strike the Martinsons' nonseverability defense. Oakes obtained a deficiency judgment against the Martinsons for $339,672, less a setoff of $79,655, for a total of $260,017.

After the district court rendered its judgment, the Martinsons, pro se, filed a legal malpractice suit against Hjellum.[4] The Martinsons employed a different attorney to appeal the district court's judgment in the personal property deficiency-judgment action. In *Oakes Farming Ass'n v. Martinson Bros.*, 318 N.W.2d 897 (N.D.1982), we affirmed, but modified the judgment by reducing the amount of the setoff from $79,655 to $150. We determined that although the December 1977 contract between Oakes and the Martinsons "originally may not have been severable," the parties had severed the contract by their stipulated settlement set forth in the findings of fact and judgment in the previous foreclosure action. *Oakes Farming Ass'n, supra,* 318 N.W.2d at 904.

Following a lengthy bench trial in the present case, during which both parties presented expert testimony, the district court determined that "Hjellum's representation of the Martinsons did not fall below the standard of performance exercised by reasonable, careful, and prudent lawyers in the practice of law in the state of North Dakota." The trial court also granted judgment against the Martinsons on Hjellum's counterclaim for reasonable attorney fees for past work performed in the amount of $16,522. Oscar Martinson has appealed.[5]

## II. *Issues*

Martinson asserts on appeal that the trial court erred in ruling that Hjellum was not

---

4. The Martinsons subsequently retained counsel to pursue the legal malpractice action.

5. Martinson has not challenged the award of attorney fees in this appeal.

liable for legal malpractice because Hjellum negligently: (1) redrafted the purchase contract between Oakes and the Martinsons; (2) failed to adequately research the law and facts, and therefore did not raise the nonseverability defense, prior to entering into the stipulated settlement of the foreclosure action; (3) failed to document in the written findings and judgment in the foreclosure action the agreement between Oakes and the Martinsons that no deficiency judgment would be sought if their net worth was less than $90,000; and (4) failed to seek an explanation from the Martinsons regarding the discrepancies between the March 1979 and December 1978 financial statements.

III. *Discussion*

 The standard of care to which an attorney is held in the performance of his professional services is that degree of skill, care, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in the State. *Sheets v. Letnes, Marshall & Fiedler, Ltd.,* 311 N.W.2d 175 (N.D.1981); *Feil v. Wishek,* 193 N.W.2d 218 (N.D.1971). An attorney is liable to his client for damages resulting from a breach of professional duty. *Johnson v. Haugland,* 303 N.W.2d 533 (N.D.1981); *Rolfstad, Winkjer, Suess, McKennett & Kaiser v. Hanson,* 221 N.W.2d 734 (N.D.1974). Thus in a legal malpractice action the plaintiff has the burden of proving by a preponderance of the evidence not only that his attorney was negligent, but that the negligence was the proximate cause of his damage. See *Feil, supra.*

 This court has often said that issues of negligence and proximate cause are questions to be decided by the trier of fact unless the evidence is such that reasonable minds can draw but one conclusion. E.g., *Layman v. Braunschweigische Maschinenbauanstalt,* 343 N.W.2d 334 (N.D. 1983). These same principles apply in

medical malpractice cases. *Peterson v. Hart,* 278 N.W.2d 133 (N.D.1979). Although we review an attorney's conduct de novo on the record in a disciplinary proceeding, e.g., *Disciplinary Board of Supreme Court v. McKennett,* 349 N.W.2d 29 (N.D.1984), we have said that, in the context of a legal malpractice action, whether or not an attorney has breached his professional duty is ordinarily a question of fact. *Sheets, supra.* We agree with the following statement of the court in *Wright v. Williams,* 47 Cal.App.3d 802, 808–809, 121 Cal.Rptr. 194, 198–199 (1975):

"[A]ttorney malpractice is to be determined by the rules that apply to professional negligence generally, subject to the necessary qualification that the court must determine legal questions which underly [sic] the ultimate decision. There are cases involving the question of attorney malpractice where reasonable minds cannot differ on the ultimate result that the conduct does or does not satisfy the duty of care. In those, the question is treated as one of law and not of fact, as it is in any negligence action.... There are cases where regardless of the attorney's negligence his advice or action was correct because of a governing legal principle so that the negligence does not proximately cause harm.... Except in those situations, the issue is one of fact." [Citations and footnote omitted.]

See also *Baker v. Beal,* 225 N.W.2d 106 (Iowa 1975); *Lenius v. King,* 294 N.W.2d 912 (S.D.1980); cf. Annot., 14 A.L.R.4th 170 (1982). The same principles apply whether or not a judge or a jury is the trier of fact. See *Lentino v. Fringe Emp. Plans, Inc.,* 611 F.2d 474 (3d Cir.1979); *O'Neil v. Bergan,* 452 A.2d 337 (D.C.App. 1982); *House v. Maddox,* 46 Ill.App.3d 68, 4 Ill.Dec. 644, 360 N.E.2d 580 (1977).

 The issues raised by Martinson in this case were questions for the trier of fact.[6] A trial court's findings of fact,

6. Although the trial court designated its findings in regard to the negligence issues as "conclusions," whether or not a particular determina-

tion is a finding of fact or a conclusion of law will be determined by the reviewing court, and labels placed upon the findings by the trial

which are given the same weight as a jury verdict, will not be set aside on appeal unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Bye v. Elvick*, 336 N.W.2d 106 (N.D.1983). A finding is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Leno v. Ehli*, 339 N.W.2d 92 (N.D.1983).

### 1. The Redrafted Contract

Martinson first asserts that Hjellum was negligent in redrafting the December 1977 contract between Oakes and the Martinsons. He relies primarily on our statement in *Oakes Farming Ass'n, supra*, 318 N.W.2d at 908, that "the contract is, at best, confusing or ambiguous as to what was actually purchased by Martinson." After hearing expert testimony on the issue, the trial court found that Hjellum exercised the appropriate degree of care in redrafting the purchase agreement because the "first agreement was vague and unclear and Hjellum worked diligently with what his clients furnished him to better protect his clients."

 A lawyer, without an express agreement, " 'is not a guarantor ... that the instruments he will draft will be held valid by the court of last resort.' " *Feil, supra*, 193 N.W.2d at 224 [quoting *McCullough v. Sullivan*, 102 N.J.L. 381, 384, 132 A. 102, 103 (1926)]. See also *Kirsch v. Duryea*, 21 Cal.3d 303, 146 Cal.Rptr. 218, 578 P.2d 935 (1978); *Dillard Smith Const. Co. v. Greene*, 337 So.2d 841 (Fla.Dist.Ct. App.1976). A successfully asserted claim of legal malpractice requires more than the fact, standing alone, that a trial or appellate court interpreted a document differently than the lawyer or his client assumed they would. *Denzer v. Rouse*, 48 Wis.2d 528, 180 N.W.2d 521 (1970).

 The record reflects that Hjellum redrafted the agreement because of various omissions in the contract. The proposed contract failed to describe the real or personal property to be sold and the amounts remaining due on the contracts to be assumed by the Martinsons. Hjellum incorporated into the agreement the contract for deed and installment sales contract between Oakes and the Streichs and the contract for deed between Oakes and the Spitzers, and also added a provision that the Martinsons would have up to one year to pay $420,000 as "additional earnest money." Although the Martinsons provided Hjellum with a list of the personal property to be purchased, they had forgotten to bring an inventory allocating individual amounts to the personal property. It appears that both parties were anxious to consummate the purchase and wished to have the agreement expedited. Under these circumstances, we cannot say that the trial court erred in finding that Hjellum did not negligently redraft the agreement.

Martinson also asserts that Hjellum created an ambiguity in the contract by including a provision that Oakes warranted good title to the real property obtained through the contracts for deed with the Streichs and Spitzers, even though the Oakes-Streich contract was subject to an option to purchase a 100-acre tract in favor of the Oakes Community Industrial Development Corporation. According to Martinson, Hjellum did not insist that a title search be conducted before the agreement was executed. It appears from the record that the Martinsons were aware of the option. The expert witness for the defense testified that conducting a title search at this stage of the proceedings would not be the usual or customary practice of attorneys because of the Martinsons' relatively limited initial investment and their request to expedite the matter. This testimony adequately supports the trial court's finding. Cf. *O'Brien v. Noble*, 106 Ill.App.3d 126, 61 Ill.Dec. 857, 435 N.E.2d 554 (1982).

 Martinson also contends that Hjellum failed to incorporate in the contract alleged promises made by Oakes that it would provide the Martinsons assistance

court are not conclusive. *E.E.E., Inc. v. Hanson*, 318 N.W.2d 101 (N.D.1982).

and advice regarding the potato operation. Hjellum denied being informed of the promises prior to the date the agreement was consummated. A trial court is not bound to accept as truth the testimony of any particular witness, and where the trial court chooses between two permissible views of the evidence, its decision on the matter is not clearly erroneous. *Bismarck Realty Co. v. Folden*, 354 N.W.2d 636 (N.D.1984).

2. The Nonseverability Defense

Martinson asserts that Hjellum failed to perform the minimal legal research an ordinarily prudent attorney would do before entering into the March 26, 1979, stipulated settlement of the foreclosure action. See *Smith v. Lewis*, 13 Cal.3d 349, 118 Cal. Rptr. 621, 530 P.2d 589 (1975). His argument continues that because Hjellum did not adequately research the law, he was unaware of the nonseverability defense set forth in *McKee v. Kinev, supra,* and therefore failed to raise the defense in the Martinsons' answer to Oakes's foreclosure action and allowed the contract to be severed in the stipulated agreement.

Regardless of whether or not Hjellum adequately researched the law before entering into the stipulation, the trial court determined that Hjellum was justified in not asserting the defense in the foreclosure action because he had a reasonable belief that the contract was severable, the question of a possible deficiency judgment was not at issue in the foreclosure action, and the issue was no longer important because he reasonably believed he had protected his clients from a deficiency judgment based on the agreement that Oakes would not seek a deficiency judgment if the Martinsons' net assets were less than $90,000. ■ Hjellum's failure to raise the nonseverability defense in the foreclosure action did not constitute legal malpractice as a matter of law. The Martinsons' expert witness testified that the December 1977 agreement was not severable and Hjellum's expert witness testified that it was severable. Indeed, whether or not a contract is severable depends on a number of factors, none of which are necessarily determinative. "The subject matter of the contract together with other facts and circumstances relating to the contract, including the conduct of the parties, must be considered along with whether or not there was an apportionment of the consideration between real and personal property." *Oakes Farming Ass'n, supra,* 318 N.W.2d at 904. See also *Soderstrom v. White,* 68 N.D. 293, 279 N.W. 306 (1938).

We need not determine whether or not the agreement was initially severable, because even if it was not, we agree with the trial court's finding that under Hjellum's strategy, he reasonably believed he had protected his clients from a deficiency judgment by virtue of the agreement that Oakes would not seek a deficiency judgment if the Martinsons' net assets were less than $90,000. John Martinson assured Hjellum that the financial statement would show a true net worth of less than $90,000. Hjellum decided to set his settlement strategy on this assurance from his clients rather than on the nonseverability defense which he believed to be of doubtful application to the December 1977 agreement.

In *York v. Stiefel,* 109 Ill.App.3d 342, 350–51, 64 Ill.Dec. 888, 894–895, 440 N.E.2d 440, 446–447 (1982), *affirmed in part and reversed in part on other grounds,* 99 Ill.2d 312, 76 Ill.Dec. 88, 458 N.E.2d 488 (1983), the court stated:

"Attorneys are retained to exercise their judgment on behalf of their clients in areas where there are no sure and definite answers and attorneys cannot always determine future courses of action by precise mathematical equations. Criticism in hindsight of one of many courses of action is not probative of negligence and the mere opinion by a particular attorney that the defendant's course of action is not the same as that which the expert might have chosen is not testimony probative of malpractice. The issue in any professional negligence case is whether or not the actual advice that was given or the act performed was an

act which should not be performed by a reasonably prudent professional in the area where the defendant practices."

We cannot say the trial court erred in finding that Hjellum acted reasonably in choosing the course of action he did based on the representations made to him by his clients.

### 3. Failure to Document the Agreement

Martinson next asserts that Hjellum was negligent in failing to document in the written findings and judgment in the foreclosure action the agreement that no deficiency-judgment action would be brought against the Martinsons if their net worth was less than $90,000. If we were to assume, *arguendo*, that Hjellum was negligent in this regard, Martinson also had the burden of proving that such negligent conduct was the proximate cause of his injury. See *Public Taxi Service, Inc. v. Barrett*, 44 Ill.App.3d 452, 2 Ill.Dec. 789, 357 N.E.2d 1232 (1976); *Arnold v. Fechtel*, 279 Or. 411, 568 P.2d 659 (1977). Even if Hjellum had included the agreement in the written findings and judgment, or had been successful in seeking relief from the judgment under Rule 60, N.D.R.Civ.P., his actions would not have protected Martinson because the record contains sufficient evidence to establish that the Martinsons' net assets exceeded $90,000. Thus the proximate cause of the Martinsons' injury was not Hjellum's failure to include the agreement in the written findings and judgment, but the Martinsons' assurances that their net assets were less than $90,000 coupled with their submission of the inaccurate financial statement.

### 4. Failure to Consult

Finally, Martinson asserts that legal malpractice was established when Hjellum, upon discovering the discrepancies between the March 1979 and December 1978 financial statements, failed to seek an explanation of the discrepancies from his clients. Martinson's argument is primarily based on Canon 7, DR 7–102(B)(1), EC 7–5 and EC 7–8 of the North Dakota Code of Professional Responsibility.

The Code of Professional Responsibility does not "undertake to define standards for civil liability of lawyers for professional conduct" [Preliminary Statement, North Dakota Code of Professional Responsibility], and courts have held that violations of the Code constitute only rebuttable evidence of legal malpractice. *Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980); *Lipton v. Boesky*, 110 Mich.App. 589, 313 N.W.2d 163 (1981). Thus, assuming that there was such a violation in this case, it merely constituted evidence to be considered by the trier of fact.

The March 1979 financial statement listed the Martinsons' net worth as $46,076. Hjellum testified that when he found the December 1, 1978, financial statement of the Martinsons, he discovered a "$237,000 reduction in the statement of March 29th from the statement of December 1st, '78, a period of less than four months when there would have been practically no depreciation or wear and tear on these articles." Another financial statement of the Martinsons dated December 14, 1979, revealed their net worth to be $210,079. Hjellum testified that he saw no reason to discuss the discrepancies with the Martinsons or assert that no deficiency-judgment action could be brought based on the agreement with Oakes because he had acquired the correct information and would not lie for them.

Having carefully reviewed the record, we cannot conclude that the trial court's finding that Hjellum acted reasonably under the particular circumstances of this case is clearly erroneous. We further note that, in any event, the proximate cause of the Martinsons' damage was their furnishing of the inaccurate financial statement, not Hjellum's failure to consult with them about the discrepancies.

For the reasons stated in this opinion, Hjellum's motion to dismiss the appeals is

granted in part and denied in part, and the judgment is affirmed.

ERICKSTAD, C.J., and PEDERSON and GIERKE, JJ., concur.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.