Thomas Balames, individually and as attorney in
fact for Richard J. Kostyra et al., appellee,
v. Robert V. Ginn and Brashear LLP,
formerly known as Brashear
and Ginn, appellants.

___ N.W.2d ___

Filed April 17, 2015.    No. S-13-1087.

1.  **New Trial: Appeal and Error.** An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion.

2.  **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3.  **New Trial.** A court should sustain a motion for new trial only when an error has occurred that is prejudicial to the rights of the unsuccessful party.

4.  ____. A district court has inherent authority to order a new trial, in the same term, where necessary to correct prejudicial errors—especially its own errors—in the trial.

5.  **New Trial: Juries.** A court's inherent authority to correct prejudicial errors in a trial does not include the power to invade the province of the jury and to set aside the verdict and grant a new trial because the court arrived at a different conclusion than the jury on the evidence that went to the jury.

6.  **Malpractice: Attorney and Client: Negligence: Proof: Proximate Cause: Damages.** In a civil action for legal malpractice, a plaintiff alleging professional negligence on the part of an attorney must prove three elements: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) the attorney's negligence was a proximate cause of the client's loss.

7.  **Malpractice: Attorney and Client.** A client cannot recover in a legal malpractice case when the alleged injury was caused by the client's own conduct.

8.  **Malpractice: Negligence: Proximate Cause.** A plaintiff's contributory negligence is a defense in a malpractice action when it contributed to the professional's inability to meet the standard of care and was a proximate cause of the plaintiff's injury.

9.  **Malpractice: Torts.** A legal malpractice action is governed by tort principles.

10. **Malpractice: Attorney and Client: Negligence.** A client's contributory negligence may be a defense in an appropriate legal malpractice action.

11. **Attorneys at Law: Trial.** A trial court has discretion to determine whether an attorney's closing argument exceeds the legitimate scope of the issues.

12. **Directed Verdict: Evidence.** A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

13. **Directed Verdict: Appeal and Error.** In reviewing a directed verdict, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.

14. **Attorney and Client.** A client has the ultimate authority to determine the objective of a legal representation.

15. ____. An attorney should make reasonable efforts to explain the legal consequences of a course of conduct that a client insists upon taking.

16. **Malpractice: Attorney and Client.** The breach of a duty in a legal malpractice action is a fact-specific inquiry. Only when reasonable people could not disagree about the foreseeability of the injury should a court decide this issue as a matter of law.

17. **Malpractice: Attorney and Client: Expert Witnesses.** In a legal malpractice action, the factual inquiry as to whether an attorney breached a duty of care must be supported by expert opinion.

18. **Attorney and Client.** Upon the termination of a legal representation, a lawyer should take steps to the extent reasonably practicable to protect a client's interests.

19. **Malpractice: Attorney and Client.** A client cannot recover for legal malpractice when the attorney has relied on the client's misrepresentations.

20. **Juries: Verdicts: Presumptions.** When the jury returns a general verdict for one party, a court presumes that the jury found for the successful party on all issues raised by that party and presented to the jury, particularly when the opposing party did not ask the court to give the jury a special verdict form or require the jury to make special findings.

Appeal from the District Court for Douglas County: James T. Gleason, Judge. Judgment vacated, and cause remanded with directions.

Mark C. Laughlin and Patrick S. Cooper, of Fraser Stryker, P.C., L.L.O., for appellants.

Steven E. Achelpohl, of Gross & Welch, P.C., L.L.O., Lawrence J. Acker, of Lawrence J. Acker, P.C., and Jay Ferguson for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## SUMMARY

The appellee, Thomas Balames, filed this legal malpractice action against Robert Ginn and Brashear LLP, formerly known as Brashear and Ginn (collectively Ginn), the firm where Ginn practiced when the alleged malpractice occurred. Balames brings this action for himself and three other individuals for whom he serves as attorney in fact (collectively

Balames). Balames claimed that Ginn negligently failed to obtain signatures on a guaranty for a loan that Balames made to a third party and failed to inform Balames of the missing signatures. When the third party defaulted, Balames could not obtain a judgment against the individuals who were the intended guarantors for the full amount of the third party's obligation. The jury returned a general verdict for Ginn, but the court granted Balames a new trial.

Ginn assigns multiple errors to the district court's rulings, but we decide this appeal primarily on one issue: whether the court erred in granting Balames a new trial. We conclude that it did. We therefore vacate the court's order that sustained Balames' motion for a new trial and remand the cause with instructions for the court to reinstate the judgment for Ginn.

## BACKGROUND

### Transaction Documents to Restructure Debt Owed to Balames

In 2003, a large hog farm operation called Bell Farms defaulted on a $3-million loan from Balames. In 2004, Balames agreed to restructure the debt with a new entity called Banopu, LLC, which is an acronym for "Balames Note Purchase." Two members of Banopu were the general partners of Bell Farms. Ginn was Balames' attorney for this transaction and worked with the attorney for Banopu and the guarantors to draft the closing documents.

The first document was a purchase agreement in which Banopu agreed to (1) "purchase" the loan that Balames made to "Sun Prairie"—an entity related to Bell Farms—for $3 million; (2) assign its right to payments from Sun Prairie to Balames for 4 years; (3) execute a promissory note to Balames for the purchase price; and (4) make payments to Balames as set out in a payment schedule. Members of Banopu who were identified as "guarantors" promised to guarantee payment of the purchase price. Balames promised to deliver the original loan documents—including promissory notes and guaranties—to Banopu on the effective date. That date was whenever a separate financial transaction closed, and the purchase agreement was contingent upon that event.

Under the purchase provision, the interest rate for the purchase price was the prime rate plus 4 percent. But under a separate "default interest" provision, the interest rate increased to the prime rate plus 13.25 percent if Banopu or Sun Prairie defaulted on their payments.

The second document was the promissory note. It stated that the note was secured by the guaranties of Banopu's members. The transaction contemplated that Banopu's 11 members would sign a separate guaranty, promising to pay Balames the amount due under the note if Banopu failed to cure any default in payments. Like the purchase agreement, the note included a provision for a higher interest rate if Banopu defaulted on payments.

## NORTH DAKOTA LITIGATION

In 2007, Banopu defaulted on the loan. The record shows that only one Banopu member had signed the separate guaranty. In 2008, Balames sued Banopu and its members in a North Dakota court to collect the money and interest that Banopu owed on the loan. After a trial, that court determined that Banopu's members intended to guarantee the purchase price of $3 million plus regular interest. But because all the intended guarantors did not sign the separate guaranty, the court determined that Banopu's members were not liable for the higher interest rate imposed on Banopu if it defaulted on the payments. It determined that Banopu was liable for $3,946,092.92, which included interest at the rate of prime plus 13 percent. But it ruled that Banopu's members were liable for only $3,349,865.48 at the statutory interest rate of 7 percent.

## PARTIES' PLEADINGS

Balames alleged that Ginn was negligent for failing to (1) draft a complete guaranty to secure the purchase price and the promissory note; (2) circulate and secure the guaranties; (3) notify Balames of Ginn's failure to secure the guaranties; and (4) assist Balames to collect the balance of the note, interest, and attorney fees. For damages, he sought the difference between the $3,946,092.92 judgment

he obtained against Banopu at the higher interest rate and the amounts he collected from Banopu and its members. He also sought $337,051.14 in attorney fees for his attempted enforcement of the guaranty, for total damages in the amount of $1,315,598.46.

Ginn denied all allegations of negligence and alleged that Balames had failed to state a cause of action. Additionally, Ginn alleged that Balames' claim was barred by the statute of limitations, equitable estoppel, laches, failure to mitigate damages, the doctrine of unclean hands, and the negligence or contributory negligence of Balames or other individuals.

### Evidence at Trial

In 2000, Balames formed a business called Accelerated Assets (Accelerated), an investment company specializing in purchasing or "lending against" debt portfolios. To make the loan to Bell Farms, he and his business associates borrowed money from their bank and personally guaranteed the loan. When they restructured Sun Prairie's debt with Banopu, they determined that Banopu's members were capable of repaying the debt if it defaulted.

Balames said that Ginn was responsible for circulating the transaction documents for signatures and that he believed this effort was ongoing in February or March of 2004. Ginn never told Balames that any intended guarantor had balked.

Ginn agreed that he had a duty to ensure the signatures were properly affixed to the closing documents and that he had not delegated this responsibility. Ginn said that he had anticipated being able to review the documents after the circulation for signatures was completed. He knew that obtaining the Banopu members' personal guaranties was crucial to Balames. But Banopu's members were reluctant to sign the guaranty until they had possession of the original loan documents. Ginn said Balames knew about their resistance and Ginn's efforts to obtain their signatures. Ginn explained that the Banopu transaction was a smaller part of a much larger reconfiguration of Sun Prairie's debt. He said a larger and separate transaction had to close before Ginn could get signed copies for the Banopu transaction. He said there was

no scheduled closing date for the Banopu transaction because he could not control when the Banopu members would finally sign the documents.

The larger transaction was scheduled to close on July 6, 2004. Ginn said that on June 30, just before he went on vacation, he sent the documents for the larger transaction, with Balames' signature, to an attorney for the guarantors and to Balames. Ginn said Balames expressed no sense of urgency about closing the Banopu transaction when Ginn left for vacation. But after the larger transaction closed on July 6, Ginn received e-mails and telephone calls from Balames that he had to close the Banopu transaction immediately because the bank was pressuring him. Balames agreed his bank was pressuring him to obtain the loan documents.

The record shows that on July 7, 2004, Balames e-mailed Ginn while he was on vacation and asked him to "overnight today — if at all possible — a complete set of executed banopu loan documents" to his bank. Balames provided the address of the banker to whom he wanted the documents sent: "if you could confirm via email that when they go, i would appreciate it very much." Balames e-mailed again: "are you going to have them tomorrow??? i need to get them to the bank as quickly as humanly possible...any ideas???" Ginn then forwarded Balames' original e-mail with the banker's address to an attorney for the guarantors with the following message: "I have talked to [Balames] and he absolutely needs you to overnight the originals to his bank per the e-mail forwarded herewith. Please send copies to me." Afterward, Ginn reported to Balames that the documents "are being overnighted to me and, upon receipt, I will copy and send on per your instructions." About an hour later, Ginn e-mailed Balames again: "I will have the originals sent directly to the bank, if you wish, with copies to me. My fear is there will be something wrong/missing/etc that we won't have the opportunity to catch and fix first."

On July 9, 2004, the opposing attorney sent Ginn an e-mail that referred to an attachment: "See attached completely executed Purchase Agreement. The original note and a copy of the Purchase Agreement with Banopu's signature has been

delivered to Balames' bank today. They need the guarantors' signatures yet for the Purchase Agreement. Please forward them on to [Balames'] bank." The opposing attorney sent this e-mail to Balames also.

On July 12, 2004, Balames sent Ginn another e-mail: "[T]his is what i have received from [the opposing attorney] and have subsequently forwarded to the bank. is this everything???" Ginn responded on July 13: "I am on vacation with the worst dial-up internet access imaginable and I can't open documents. [I have] confirmed that the purchase agreement was sent to you and that the note and guaranty were sent directly to the bank. Can you confirm this with the bank?"

Balames said that when Ginn wrote he would forward the copies to the bank and keep a copy, he believed that Ginn would review the documents to make sure they were properly executed. He could not recall Ginn's reporting that he did not receive the documents. Balames said Ginn never told him to go to the bank and inspect the documents for signatures or to ensure that the bank received them. Balames could not recall having any telephone calls with Ginn while Ginn was on vacation or asking the bank to postpone the closing until Ginn returned from vacation.

On cross-examination, however, Balames said that he called the bank to confirm that the documents had arrived. He could not recall the conversation but remembered receiving a confirmation that the documents were there. He could not recall telling Ginn that he confirmed the bank's receipt of the documents. When asked if he would dispute Ginn's testimony that he had done so, Balames said that he would have only checked to see if the bank received a package from Ginn.

Balames knew that the guaranty was being circulated and had to be signed to close the deal. But he could not recall a separate transaction that had to close before the Banopu transaction could close. Balames denied telling Ginn to stop work in July 2004. But he was impeached with his deposition testimony that he could not recall telling Ginn to stop work.

Ginn testified that he received no attachment to the July 9, 2004, e-mail from the opposing attorney and could not open the attachment that Balames sent with his July 12 e-mail.

Ginn said the e-mails were only part of his conversations with Balames. He advised that they postpone the closing until he returned, but Balames refused to wait. So Ginn suggested that Balames send him the documents overnight for review and then Ginn would send them to the bank. Balames said that this procedure was not fast enough. Ginn then called the opposing attorney, who told him the signed copies had been sent to the bank. And Ginn said Balames confirmed to him in a telephone call that the bank had received the *signed* note and guaranty. Ginn told Balames that as soon as he returned, they would get everything "tied up."

But Ginn said that he performed no further work because Balames fired him on July 13, 2004. Ginn said Balames told him that the guarantors were paying for Ginn's services only through the closing and that Balames would not pay Ginn after that. So Ginn did not attempt to confirm that all the signatures had been obtained. He said Balames never asked him to do any further work. He denied that he had any responsibility to review the documents after Balames directed him to stop work. Eventually, it was discovered that no copy of the separate guaranty was filed with the bank for the Banopu transaction.

Both parties presented expert testimony to opine whether Ginn had breached the professional standard of care. Two of Balames' experts testified that Ginn had breached the standard because he failed to ensure that someone in his firm was available to review the documents while he was on vacation and failed to review the documents after he returned. One expert opined that Ginn had breached the standard of care even if he offered to review the documents while he was on vacation. The other agreed that Ginn could meet the standard of care by reviewing the documents while on vacation. Both of them believed Ginn had a professional duty to review the documents when he returned from vacation to protect Balames' interests, even if Balames had terminated his services. But one of Balames' experts conceded that if Balames told Ginn the bank had received signed closing documents, then Ginn was entitled to rely on that statement and did not breach the standard of care.

Ginn's expert opined that Balames had changed the scope of the attorney-client relationship while Ginn was on vacation by insisting that the closing go forward despite Ginn's warning that he should review the documents and later by directing Ginn to stop work. Because Ginn had no expectation that the Banopu transaction would suddenly become urgent while he was on vacation and he had kept in touch with Balames, he did not breach any duty by failing to prepare another attorney to handle the transaction while he was gone. And once Balames directed the transaction to close despite Ginn's advice to wait, all Ginn could do was to inform Balames that he could not review the documents and things could go wrong. Ginn's expert believed that this limited duty particularly applied with a client sophisticated in making these types of loans because Balames needed only to verify the presence of signatures, a task that is ministerial in nature.

Additionally, because of Balames' experience, Ginn's expert believed Ginn could trust Balames' confirmation that the bank had received the signed documents. Because both Balames and the bank had an interest in ensuring the signatures were present, he believed Ginn had reasonably relied on Balames' confirmation. Finally, he opined that when Balames' directed Ginn to stop work, he had a duty to follow that direction because the relationship had terminated. He explained that to countermand such directions from a competent client might harm the client in a way that an attorney could not anticipate.

### THE COURT'S DIRECTED VERDICTS AND CLOSING ARGUMENT RULING

After both sides rested, Balames moved for a directed verdict on Ginn's contributory negligence defense. The court granted the motion. The court also ruled that it would not instruct the jury on this defense. Ginn renewed his motions for a directed verdict on the malpractice claim and Ginn's statute of limitations defense, which motions the court again overruled.

The closing arguments were not recorded, but the court did record the parties' in camera arguments regarding closing

arguments. The court stated that Ginn had exposed a large chart, exhibit 140, to the jurors. Exhibit 140 listed Ginn's points in closing argument:

> FACTORS TO CONSIDER REGARDING MR. BALAMES' CONFIRMATION THAT EXECUTED DOCUMENTS HAD BEEN RECEIVED
>   1. BELIEVABLE?
>   2. CLERICAL TASK
>       - Signatures
>       - vs. drafting guaranty
>       - within competence of sophisticated client and Bank
>   3. SOPHISTICATED/RELIABLE
>       - Random, unknown person
>       - Mr. Balames
>       - Bank
>   4. SIMILAR INCENTIVE TO COMPLETE TASK
>       - Mr. Balames
>           - As quickly as humanly possible
>           - Loan expired? (Ex. 98-101)
>       - Bank
>           - $3 million loan; default; no securing documents

During the in camera hearing, Balames stated that the court had sustained his three objections to Ginn's arguments or charts as violating the court's ruling for Balames on Ginn's contributory negligence defense. Ginn responded that he was not using the charts to show Balames' contributory negligence. He argued that whether Balames was sophisticated in these transactions was relevant to whether Ginn had reasonably relied on his statements: "[T]here was testimony from every single expert in this trial not as to contributory negligence but as to the standard of care breach alone." Balames countered that Ginn was attempting to shift the duty to him to verify that the documents were signed. He argued that Ginn's testimony showed he had asked Balames only to confirm that the bank received the closing documents, not to confirm that it received signed documents. The court ruled that exhibit 140 impermissibly raised the issue of Balames' contributory negligence and that Ginn could not show it to the jury.

The court also permitted Balames to make a record of his objection to exhibit 141, a different chart. Exhibit 141 is a summary of Ginn's arguments regarding Balames' claim that he checked with the bank only to see if it had received a package from Ginn:

THE "PACKAGE" DEFENSE
   Note: brand new theory
1. [Balames] knew there were 3 separate closing docs, including a separate guaranty
   Source: [Balames]; [Ginn]; numerous e-mails
2. [Balames] knew guarant[i]es had to be signed
3. [Balames] understood [Ginn] couldn't confirm signatures and something could be missed
4. Limited [Ginn] requests make no sense:
   - confirm unsigned guarant[i]es received by the Bank?
   - confirm some, but not all, executed docs received?
   - vaguely confirm the Bank received a "package"
5. [Balames] called his own banker
   - No recollection as to who
   - No docs produced
   - No info as to where bankers are today
6. [Balames], not [Ginn], decides the deal has closed and [Ginn] should stop work.

After Balames objected, the parties discussed exhibit 141 in a sidebar. The court sustained Balames' objection to Ginn's argument using exhibit 141 and directed Ginn not to further exhibit it to the jurors. But the court stated, "It's available to them prior to [the objection]." Ginn said that he would follow the court's order but asked the court not to cause the jury to unnecessarily focus on its ruling by giving a curative instruction. The court rejected this request. It told the jurors that before the parties' in camera discussion, they had at least glimpsed a page that Ginn wanted to use in argument, but that the court had ruled the page was objectionable. It instructed the jurors that the page was argument, not evidence, and to ignore it.

### Posttrial Motions and Rulings

After the jury returned its verdict, Balames moved for a new trial and judgment notwithstanding the verdict. He offered exhibit 142, which was a summary of Ginn's alleged admissions from the trial transcript. The court responded that Balames should not waste time on the motion for judgment notwithstanding the verdict, because Balames had not moved for a directed verdict at the close of the evidence. Balames argued that the most important reason to grant a new trial was "the prejudice that occurred from repeated illustration of arguments that the Court had already ruled upon that should have been regarded as impermissible." Balames argued that Ginn used the charts to buttress arguments that were not a proper part of the trial.

Balames argued that Ginn admitted he alone had a duty to ensure the documents contained the required signatures and that he had not delegated this duty. Balames argued that Ginn had a continuing duty to protect his client and that his arguments and charts had confused the jury as to who had the duty of care by suggesting that he had reasonably relied on Balames' statements. He contended that the court could not presume the jurors had followed the law and not decided the case on Ginn's affirmative defense.

In the court's order granting a new trial, it stated that Ginn had repeatedly referred to matters relevant to Balames' contributory negligence despite the court's directed verdict for Balames and its order that this defense could not be submitted to the jury. It concluded that Ginn's repeated violation of this order was not amenable to cure by any admonition to the jury. The court further determined that Ginn's testimony made it "abundantly clear that [Ginn] violated his ethical duty to complete the transaction on the part of his client, and that his failure to complete that duty caused damage to his client." The court concluded that it had also committed plain error in failing to instruct the jury that Ginn was liable as a matter of law for all damages proximately caused by his conduct.

## ASSIGNMENTS OF ERROR

Ginn assigns, condensed and restated, that the court erred as follows:

(1) overruling his motion for directed verdict because Balames presented no competent evidence to show that Balames could have collected the third party's obligation from the intended guarantors;

(2) overruling his objections to a witness' deposition testimony and an accompanying report, which Balames presented to show the financial status of two intended guarantors;

(3) overruling his motion for a directed verdict because the statute of limitations barred Balames' malpractice claim;

(4) sustaining Balames' motion for a new trial; and

(5) sustaining Balames' motion for a directed verdict on Ginn's contributory negligence defense and refusing to instruct the jury on that defense.

## STANDARD OF REVIEW

[1,2] We review a trial court's ruling on a motion for a new trial for abuse of discretion.[1] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[2]

## ANALYSIS

Our analysis necessarily discusses the role that a client's negligence or contributory negligence plays in a legal malpractice case. As stated, however, we primarily focus on the court's order granting a new trial.

Ginn contends that the court erred in granting Balames' motion for a new trial for three reasons: (1) Ginn's closing arguments were proper, (2) the evidence supported the jury's unanimous general verdict for him, and (3) the court's admonishment to the jury that closing arguments are not evidence cured any possibility of prejudice. Ginn also contends that

---

[1] See *First Express Servs. Group v. Easter*, 286 Neb. 912, 840 N.W.2d 465 (2013).

[2] *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014).

the court incorrectly concluded that it should have directed a verdict for Balames on the issue of liability and instructed the jury that Ginn was liable as a matter of law.

Balames views it differently. He contends that the court's order was correct for two reasons: (1) Ginn's closing argument violated the court's directed verdict for Balames on Ginn's contributory negligence defense, and (2) Ginn continued this line of argument even after the court sustained Balames' objections to it. Balames argues that Ginn's repeated arguments ran afoul of two rules of professional conduct: (1) Neb. Ct. R. of Prof. Cond. § 3-503.3(a)(1) and (3), which prohibit attorneys from knowingly making a false statement or offering false evidence to a court; and (2) Neb. Ct. R. of Prof. Cond. § 3-503.4(e), which prohibits an attorney from alluding to a matter that the attorney does not reasonably believe is relevant or supported by admissible evidence. And because Ginn repeated his argument regarding Balames' negligent conduct, Balames argues that the court correctly determined that it could not cure the improper argument by any admonition to the jury. Thus, a new trial was required.

The court's reasoning in granting a new trial shows that it considered any reference to evidence of Balames' negligence during Ginn's closing argument to be prejudicial misconduct. So even without having the parties' arguments, we can review the court's order.

[3,4] We have held that a court should sustain a motion for new trial only when an error has occurred that is prejudicial to the rights of the unsuccessful party.[3] And we have held that a district court has inherent authority to order a new trial, in the same term, where necessary to correct prejudicial errors— especially its own errors—in the trial:

> The purpose of a motion for a new trial is to afford the trial court an opportunity to correct errors that have occurred in the conduct of the trial. The trial court has inherent power over its judgments to correct errors and mistakes therein even to the extent of granting a new trial where such is necessary, whether or not a new trial is

---

[3] See *Wendeln v. Beatrice Manor*, 271 Neb. 373, 712 N.W.2d 226 (2006).

requested or a motion for a new trial is filed. Such inherent power to grant a new trial is limited to those situations where prejudicial error appears in the record.[4]

[5] But a court's inherent authority to correct prejudicial errors in a trial does not include the power to invade the province of the jury and to set aside the verdict and grant a new trial because the court arrived at a different conclusion than the jury on the evidence that went to the jury.[5] And the court failed to recognize that the parties were disputing genuine issues of material fact.

Initially, we reject Balames' baseless argument that Ginn's attorney knowingly made false statements to the court, offered false evidence, or made arguments based on evidence that he reasonably should have known was inadmissible or irrelevant. The record contains ample *admitted* evidence from which a jury could have determined that (1) Balames insisted upon immediately closing the restructured debt transaction despite Ginn's advice to wait until he could review the documents and (2) Balames directed Ginn to stop working on the case immediately after the closing. Moreover, even if Ginn's attorney was wrong that Balames' negligence was a relevant consideration after the court directed a verdict on Ginn's contributory negligence defense, he did not refer to evidence in his closing argument that he knew to be irrelevant.

But Ginn was not wrong in thinking that the evidence was relevant. Instead, the problem was the court's conclusion that Balames had no duty to protect his own interests in the closing and therefore could not be a proximate cause of his own injury.

[6,7] In a civil action for legal malpractice, a plaintiff alleging professional negligence on the part of an attorney must prove three elements: (1) the attorney's employment, (2) the

---

[4] *Harman v. Swanson*, 169 Neb. 452, 454, 100 N.W.2d 33, 35 (1959). Accord, *Quinlan v. City of Omaha*, 203 Neb. 814, 280 N.W.2d 652 (1979); *DeVries v. Rix*, 203 Neb. 392, 279 N.W.2d 89 (1979); *Gate City Co. v. Douglas County*, 135 Neb. 531, 282 N.W. 532 (1938).

[5] See *Greenberg v. Fireman's Fund Ins. Co.*, 150 Neb. 695, 35 N.W.2d 772 (1949).

attorney's neglect of a reasonable duty, and (3) the attorney's negligence was a proximate cause of the client's loss.[6] So a client cannot recover in a legal malpractice case when the client's own conduct caused the injury.[7] As relevant here, courts have held that a client cannot recover for malpractice in the following circumstances: (1) when the client failed to follow the attorney's reasonable advice[8]; (2) when the client directed the attorney's actions in a matter and the attorney acted in accordance with the client's instruction[9]; and (3) when the client misrepresented material facts upon which the attorney relied.[10]

[8-10] We have similarly held that a plaintiff's contributory negligence is a defense in a malpractice action when it contributed to the professional's inability to meet the standard of care and was a proximate cause of the plaintiff's injury.[11] We have explained that tort principles govern a legal malpractice action.[12] And we upheld an affirmative defense under the doctrine of avoidable consequences, which bars a plaintiff's recovery for those damages that the plaintiff could have avoided by reasonable efforts.[13] So we agree that a client's contributory negligence may be a defense in an appropriate legal malpractice action. And there was evidence from which a reasonable fact finder could have found that Balames prevented Ginn from meeting the standard of care, and that his

---

[6] See *Harris v. O'Connor*, 287 Neb. 182, 842 N.W.2d 50 (2014).

[7] See, generally, Annot., 10 A.L.R.5th 828 (1993).

[8] See, e.g., *Ott v. Smith*, 413 So. 2d 1129 (Ala. 1982); *W. Fiberglass v. Kirton, McConkie etc.*, 789 P.2d 34 (Utah App. 1990).

[9] See, e.g., *Boyd v. Brett-Major*, 449 So. 2d 952 (Fla. App. 1984); *Grenz v. Prezeau*, 244 Mont. 419, 798 P.2d 112 (1990).

[10] See, e.g., *Blackstock v. Kohn*, 994 S.W.2d 947 (Mo. 1999); *Martinson Bros. v. Hjellum*, 359 N.W.2d 865 (N.D. 1985).

[11] See, *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990); *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300 (1984).

[12] See *Borley Storage & Transfer Co. v. Whitted*, 271 Neb. 84, 710 N.W.2d 71 (2006).

[13] See *id*.

conduct was a proximate cause of his own injury, by insisting on proceeding with the closing when he knew that Ginn had not reviewed the documents.

[11] Although we do not agree with the court's directed verdict on contributory negligence, we agree that at trial, its ruling precluded Ginn from arguing that defense to the jury. And a trial court has discretion to determine whether an attorney's closing argument exceeds the legitimate scope of the issues.[14] But even within those parameters, the court erred in concluding that Ginn's repeated references to Balames' negligence were prejudicial misconduct. Balames' negligence was also relevant to the causation element of his malpractice claim.

Frequently, a client's negligence in a legal malpractice case is more relevant to negating the proximate causation element of the claim than to showing that the plaintiff's negligence was a contributing cause of the plaintiff's injury:

> Most of the earlier decisions, which purported to involve contributory negligence, instead concerned acts or omissions by the client that demonstrated or explained why the attorney was not negligent. Such decisions do not involve contributory negligence, since the defense presupposes negligence by the attorney and precludes or reduces recovery if the client's negligence also was a contributing or proximate cause. Thus, a jury instruction to deny recovery if the plaintiff's negligence was the proximate cause of the damage concerns causation, not contributory negligence.[15]

Here, Ginn specifically alleged that Balames' own negligence *or* contributory negligence barred his claim. So even if the court had correctly directed a verdict for Balames on Ginn's contributory negligence defense, it failed to recognize that the same evidence was relevant to proving that Ginn did not cause Balames' injury.

---

[14] See, e.g., Jacob A. Stein, Closing Argument § 16 (2001); 75A Am. Jur. 2d *Trial* § 453 (2007).

[15] 3 Ronald E. Mallen & Allison Martin Rhodes, Legal Malpractice § 22:2 at 104-05 (2015).

Equally important, the court erred in concluding that plain error permeated the proceedings because it did not instruct the jury that Ginn was liable for malpractice as a matter of law for failing to complete the transaction for Balames. Ginn correctly argues that questions of fact would have precluded a directed verdict on that issue.

[12,13] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[16] In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.[17] Viewing the evidence in the light most favorable to Ginn, the jury could have reasonably determined Balames knew that Ginn had not reviewed the transaction documents and insisted on proceeding with the closing despite that knowledge. Under Ginn's version of the facts, Balames both ignored Ginn's advice and directed his actions.

[14,15] Balames admitted to being pressured by his bank to complete the transaction, and he insisted upon getting the documents to the bank as soon as humanly possible. Ginn's evidence supported a reasonable inference that because Balames and his business associates had personally guaranteed the loan, they had an immediate need to show the bank that they had renegotiated the debt with Banopu. The crucial point here is that a client has the ultimate authority to determine the objective of a legal representation.[18] Of course, an attorney should make reasonable efforts to explain the legal consequences of a course of conduct that a client insists upon taking.[19] Yet, evidence regarding Ginn's advisement raised a question of fact whether Ginn had breached a duty of care. That is, if the jury determined that Balames insisted upon closing without Ginn's review, whether Ginn's advisements

---

[16] *Lesiak v. Central Valley Ag Co-op*, 283 Neb. 103, 808 N.W.2d 67 (2012).

[17] See *id*.

[18] See Neb. Ct. R. of Prof. Cond. § 3-501.2(a) (rev. 2008).

[19] See Neb. Ct. R. of Prof. Cond. §§ 3-501.2(f) (rev. 2008) and 3-501.4.

were sufficient to inform Balames of the potential conse-
quences was a question of fact.

[16,17] In other words, a question of fact existed whether
Ginn breached a duty to advise Balames because it was reason-
ably foreseeable that Balames would not understand that he
must check the transaction documents for signatures.[20] Because
tort principles govern,[21] the breach of a duty in a legal mal-
practice action is a fact-specific inquiry.[22] Only when reason-
able people could not disagree about the foreseeability of the
injury should a court decide this issue as a matter of law.[23] And
in a legal malpractice action, the factual inquiry as to whether
an attorney breached a duty of care must be supported by
expert opinion:

> Although the general standard of an attorney's conduct is
> established by law, the question of what an attorney's spe-
> cific conduct should be in a particular case and whether
> an attorney's conduct fell below that specific standard
> is a question of fact. . . . Expert testimony is generally
> required to establish an attorney's standard of conduct
> in a particular circumstance and that the attorney's con-
> duct was not in conformity therewith. . . . A conflict of
> expert testimony regarding an issue of fact establishes
> a genuine issue of material fact which precludes sum-
> mary judgment.[24]

Based on the conflicting evidence and expert testimony
here, reasonable people could have disagreed whether Ginn's
advisement to Balames was insufficient because it was fore-
seeable Balames would fail to grasp that a potential prob-
lem could be the absence of signatures. Ginn's expert spe-
cifically testified that Ginn had reasonably advised Balames
things could go wrong because Ginn could not review the

---

[20] See *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010).

[21] See *Borley Storage & Transfer Co.*, *supra* note 12.

[22] See *A.W., supra* note 20.

[23] *Id*.

[24] *Guinn v. Murray*, 286 Neb. 584, 608-09, 837 N.W.2d 805, 824 (2013) (citations omitted).

documents. And the expert believed Ginn's advice was particularly sufficient because of Balames' experience in these transactions and because checking for signatures required no legal expertise.

In our view, Ginn correctly argued that Balames' understanding of Ginn's warning must be assessed in light of his experience in such transactions generally and his dependence on Ginn's guidance.[25] And there was evidence from which the jury could have determined that Balames understood the importance of checking for signatures because Ginn testified that Balames told him the bank had received signed documents. If the jury believed that Balames insisted on proceeding with the closing despite an adequate advisement that things could go wrong and an understanding that he should check for signatures, then Balames was acting of his own accord and not depending upon Ginn's advice. In that circumstance, Ginn did not breach a duty to advise and Balames' failure to adequately review the documents was the sole proximate cause of his injury.

[18,19] Evidence that Balames told Ginn the bank had received signed documents, if believed, was also relevant to whether Ginn had a duty to check the documents for signatures when he returned from his vacation. It is true that upon the termination of a legal representation, a lawyer should take steps to the extent reasonably practicable to protect a client's interests.[26] But if the jury believed Ginn's testimony that Balames told him the documents were signed, then Ginn was entitled to assume the truth of this statement. As explained, a client cannot recover for legal malpractice when the attorney has relied on the client's misrepresentations.

In sum, because there were genuine issues of material fact that precluded judgment as a matter of law for Balames, the court erred in reasoning that it should have directed a verdict that Ginn was liable for malpractice as a matter of law. We refuse to hold that Ginn is liable for malpractice even if he proved that his client rejected his advice, alleviated his

---

[25] See, e.g., *Scognamillo v. Olsen*, 795 P.2d 1357 (Colo. App. 1990).

[26] See Neb. Ct. R. of Prof. Cond. § 3-501.16(d).

concerns about not following his advice, and terminated his services with instructions not to do further work on the matter for which he was hired.

[20] When the jury returns a general verdict for one party, a court presumes that the jury found for the successful party on all issues raised by that party and presented to the jury, particularly when the opposing party did not ask the court to give the jury a special verdict form or require the jury to make special findings.[27] This is true both for Ginn's failure-of-proof defense and his statute of limitations defense which barred Balames' recovery even if he proved his malpractice claim. Because the court erred in concluding that plain error permeated the trial, this presumption controlled.

## CONCLUSION

We conclude that the court abused its discretion in sustaining Balames' motion for a new trial. The court erred in failing to recognize that evidence of Balames' negligence was relevant to whether Ginn caused Balames' injury, which was a question of fact involving conflicting evidence and expert opinion.

The court also erred in concluding that plain error permeated the proceedings because the court did not instruct the jury that Ginn was liable for malpractice as a matter of law. The evidence raised questions of fact whether Ginn breached a duty to advise Balames of adverse consequences or a duty to take reasonable steps to protect Balames' interests even after Balames terminated Ginn's services. And the jury could have drawn the following inferences from Ginn's evidence:

• Balames insisted upon immediately proceeding with the closing, despite Ginn's advice to wait and offer to review the documents while he was on vacation;
• Ginn reasonably advised Balames that something could go wrong if Balames proceeded without Ginn's review because Balames understood the guarantors' signatures must be on the transaction documents;
• Ginn relied on Balames' statement that the bank had received signed transaction documents.

---

[27] *Golnick v. Callender, ante* p. 395, ___ N.W.2d ___ (2015).

If the jury believed Ginn's version of the facts, then Ginn did not breach a duty to ensure that the documents were signed before or after the closing. Instead, Balames' injury was caused by his failure to follow Ginn's advice, his failure to review the documents for the required signatures, and his misrepresentation to Ginn that the documents were signed.

Because the court incorrectly concluded that plain error permeated the trial, we presume that the jury's general verdict for Ginn shows it found for him on all the submitted issues. Those issues included (1) whether Ginn breached a duty of care, (2) whether Balames' negligence was the sole proximate cause of his own injury, and (3) whether the statute of limitations for malpractice claims barred Balames' recovery even if he proved his claim. Because we presume that the jury determined these issues in Ginn's favor, we vacate the court's judgment and remand with directions for it to reinstate the judgment for Ginn.

JUDGMENT VACATED, AND CAUSE
REMANDED WITH DIRECTIONS.

STEPHAN, J., not participating.

———————

CHAD P. JOHNSON, APPELLANT AND CROSS-APPELLEE, V.
CHRIS M. NELSON, PERSONAL REPRESENTATIVE OF
THE ESTATE OF STEWART S. MINNICK, DECEASED,
ET AL., APPELLEES AND CROSS-APPELLANTS.
___ N.W.2d ___

Filed April 17, 2015.    No. S-14-049.

1. **Summary Judgment.** Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
2. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
3. **Summary Judgment: Jurisdiction: Appeal and Error.** When reviewing cross-motions for summary judgment, an appellate court acquires jurisdiction over